Donald A. LOCK et al.,
Plaintiffs-Appellants,

v.

Leo D. JENKINS et al.,
Defendants-Appellees.

No. 79–1104.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 7, 1979.

Decided Feb. 19, 1981.

Myrna Hart, Valparaiso, Ind., for plaintiffs-appellants.

Davis L. Steiner, Deputy Atty. Gen., Indianapolis, Ind., for defendants-appellees.

Before FAIRCHILD, Chief Judge, CUDAHY, Circuit Judge, and DUMBAULD, Senior District Judge.*

FAIRCHILD, Chief Judge.

This appeal involves allegations under 42 U.S.C. § 1983 by plaintiffs-appellants, pretrial detainees [1] (commonly known as safekeepers) held pursuant to state statute [2] at the Indiana State Prison at Michigan City, Indiana that the conditions of their confinement violated their rights under the First, Sixth, and Fourteenth Amendments to the United States Constitution.[3] The action dates from a *pro se* complaint filed by Donald A. Lock on August 12, 1975. A second amended complaint was filed with the assistance of counsel on December 23, 1975. Named as defendants in this class action are the warden and several other prison officials, two officials of the Indiana Department of Correction, and the five members of the Indiana Board of Correction. The plaintiffs sought damages and injunctive and declaratory relief. After a three-day trial on the merits, the district court ruled on December 27, 1978 [4] that plaintiffs had failed to prove any constitutional violation and accordingly denied relief. The plaintiffs appeal.

The district court made extensive findings of fact and conclusions of law. Appellants do not claim that any of the findings of fact is clearly erroneous. Rather, appellant urges reversal on the following grounds: (1) The conditions of confinement [5] taken as a whole rather than considered separately constitute violations of the safekeepers' rights to due process and equal protection; (2) Punitive seclusion was imposed upon several safekeepers without observance of procedural due process; (3) Restrictions upon visits by family members with safekeepers violated First Amendment associational rights; (4) Prison practices restricted safekeepers' access to attorneys, in violation of the First and Sixth Amendments; (5) On several occasions, correctional officers engaged in unprovoked attacks on safekeepers by the use of tear gas; and (6) Defendants' actions were taken in bad faith and therefore defendants are not immune from damages.

The test for determining the constitutionality of treatment of pretrial detainees alleged to deprive them of liberty without due process of law is "whether those

---

* The Honorable Edward Dumbauld, Senior District Judge of the Western District of Pennsylvania, is sitting by designation.

1. The trial court certified the plaintiffs under Rule 23(b)(2) as representatives of a class of pretrial detainees at the Indiana State Prison, except for those voluntarily placed in the institution's general population.

2. *Ind.Code* § 35–2.1–1–1 (1971). These pretrial detainees are sent to the prison primarily for medical or security reasons. Typical non-medical reasons for sending pretrial detainees to the prison were that jail officials considered the detainees to be in danger from or a danger to other detainees. One safekeeper had previously escaped from county jails. The average length of confinement of safekeepers at the prison was two months. Several pretrial detainees stayed at the prison for much longer than two months; one was a safekeeper for three years. One hundred and nine men were confined at the prison as safekeepers in the period from November 1, 1974 to October 2, 1978.

3. The plaintiffs had claimed violations of the Eighth Amendment but waived those claims before trial following the United States Supreme Court decision in *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977).

4. *Lock v. Jenkins*, 464 F.Supp. 541 (N.D.Ind. 1978).

5. The specific conditions complained of relate to the following categories: (a) size of cells; (b) amount of recreation time outside of cells; (c) mail procedure; (d) visitations; (e) access to telephones; (f) showers; (g) access to courts; (h) access to medical services; (i) use of tear gas; and (j) loss of property.

conditions amount to punishment of the detainee." [6] *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1872, 60 L.Ed.2d 447 (1979). The judgment appealed from was entered before the United States Supreme Court decision in *Wolfish.* The *Wolfish* Court indicated that the Eighth Amendment prohibition of cruel and unusual punishment is inapplicable to pretrial detainees who, unlike convicted prisoners, cannot constitutionally be subjected to punishment. [7] At several points in its opinion, the district court appeared to be judging the appropriateness of treatment of these safekeepers by the standards of the Eighth Amendment, while at other times the court applied the appropriate due process test for judging whether the plaintiffs' constitutional rights were violated by the conditions to which they were subjected. [8] "[T]he determination whether these restrictions and practices constitute punishment in the constitutional sense depends on whether they are rationally related to a legitimate nonpunitive governmental purpose and whether they appear excessive in relation to that purpose." *Wolfish,* 441 U.S. at 561, 99 S.Ct. at 1885.

■ Plaintiffs argue that the district court erred in considering each of the alleged constitutional violations separately rather than determining whether all the conditions cumulatively constitute unconstitutional treatment. This court finds it appropriate to consider together all the conditions of confinement in order to determine

**6.** Absent an expression of intent to punish, determination that the practice complained of amounted to punishment turns upon whether the action is reasonably related to a legitimate governmental objective. The *Wolfish* Court expressed this as follows:

> The factors identified in *Mendoza-Martinez* provide useful guideposts in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word. A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on 'whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].' *Kennedy v. Mendoza-Martinez,* 372 U.S., [144] at 168–169, [83 S.Ct. 554, 567–68, 9 L.Ed.2d 644]. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

441 U.S. at 539, 99 S.Ct. at 1874 (citations and footnotes omitted).

**7.** This court, prior to *Wolfish,* had recognized the inapplicability of the Eighth Amendment to pretrial detainees. *Duran v. Elrod,* 542 F.2d 998 (7th Cir. 1976). The due process clause, forbidding all punishment of pretrial detainees, is thus more inclusive in its protection than the Eighth Amendment, which would allow punishment as long as it is not cruel and unusual. Cases determining that conditions or practices violate the Eighth Amendment remain useful, however, because a *fortiori* such conditions or practices amount to punishment when applied to detainees.

**8.** Regarding recreation and exercise, the district court opinion indicated that "confinement for long periods ... without opportunity for regular exercise does ... constitute cruel and unusual punishment.... [The condition here] comports with constitutional requisites." 464 F.Supp. at 551. The second conclusion of law defines cruel and unusual punishment, leading to the inference that the Eighth Amendment was being applied in the court's judgment. At other points in the opinion the court found conditions or practices not to violate the Eighth Amendment. *Id.* at 548, 550.

In its discussion of access to medical services, the district court indicated that the plaintiffs had alleged cruel and unusual punishment—a claim which they had dropped as inapplicable—and that "[i]t is questionable whether the Eighth Amendment's prohibition against cruel and unusual punishment is applicable to a pre-trial detainee...." *Id.* at 552. This comment is inconsistent with the court's practice elsewhere in the opinion of apparently applying the Eighth Amendment test.

Throughout the opinion, the court found that particular conditions were constitutional. It is often not clear whether the cruel and unusual punishment clause or the due process clause, both referred to in the opinion, is being applied by the court.

whether they meet the *Wolfish* test of amounting to punishment.[9]

The district court made numerous findings regarding the placement of safekeepers at the prison and the time they are allowed to spend out of their cells. Most safekeepers arrive at the prison with a committing order which does not specify the reason for commitment, unless the detainee is in need of medical care. The detainees needing medical care are housed in the prison hospital. The remaining detainees are housed in the Admissions and Orientation (A & O) Unit,[10] although in the past detainees were held in other security units. The reasons for placement in the A & O Unit were that "the committing authority provides no background information thus it is safer to isolate them from the general prison population and that unit is the best possible place consistent with good safety and security not only for the detainee but for convicted inmates and staff." 464 F.Supp. at 544. The court found that the prison officials attempted to get background information about pretrial detainees from the committing courts. The prison officials do not determine where to place the detainees on the basis of individual needs but rather assign all but the medical cases to the A & O Unit. One of the factors used by prison officials in deciding to use the A & O Unit for pretrial detainees is that they are sent to the prison because they presented "some type of security, disciplinary or management problem for the committing county and thus required special security considerations to assure their presence at trial." Finding of Fact 21.

In 1975 safekeepers were allowed out of their cells two or three times weekly for two hours each time for recreation and showers. From 1976 onwards, the court found that safekeepers were allowed out of cell two hours each day. The safekeepers were treated the same as convicted persons in the A & O Unit. Outdoor recreation was allowed when weather permitted. Findings of Fact 36–39, 41. The court found that "recreation . . . and length of time in a cell are determined by security needs of the institution." Finding of Fact 40. The cells in A & O Unit each housed one person and measured 8 feet by 4 feet 8 inches, a total of 37 square feet. Each cell contained a bed, a toilet, and a sink which together took up 20 square feet, leaving 17 square feet for the inhabitant of the cell to move around. Safekeepers spent at least 22 hours daily in their cells and ate their meals in the cells by sitting on their beds and balancing trays on their legs. The district court concluded that housing the safekeepers in their cells twenty-two hours per day is not unconstitutional under the circumstances present here. Conclusion of Law 24. While recognizing that the two hours daily of recreation or exercise out of cells was "not ideal," the court concluded that that amount of time was sufficient to meet constitutional requirements. 464 F.2d at 551. The court never addressed itself to the size of the cells or its relationship to the amount of time out of cells.

---

**9.** Although the Eighth Amendment is not applicable to pretrial detainees, Eighth Amendment cases involving conditions of convicted prisoners are useful by analogy because any prohibited "cruel and unusual punishment" under the Eighth Amendment obviously constitutes punishment which may not be applied to pretrial detainees. In *Hutto v. Finney*, 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), involving a challenge to conditions of imprisonment of convicted persons in Arkansas prisons, the United States Supreme Court employed a cumulative approach in considering related prison conditions:

> The court took note of the inmates' diet, the continued overcrowding, the rampant violence, the vandalized cells, and the lack of

professionalism and good judgment on the part of the maximum security personnel. 410 F.Supp., at 277 and 278. The length of time each inmate spent in isolation was simply one consideration among many. We find no error in the court's conclusion that, *taken as a whole, conditions in the isolation cells continued to violate the prohibition against cruel and unusual punishment.*

*Id.* at 687–88, 98 S.Ct. at 2571–72 (emphasis added). *Accord, Ramos v. Lamm*, 485 F.Supp. 122, 155 (D.Colo.1979) and cases cited therein.

**10.** Also housed in A & O Unit were prisoners newly committed to the prison and inmates requesting protective custody.

In *Bell v. Wolfish* the Supreme Court found no due process violation in keeping two pretrial detainees in a cell measuring seventy-five square feet. There, the Court stressed that inmates were required to be in their cells for only seven or eight hours daily and were able to move freely between the cells and a common area for the rest of the day. The Court's reasoning in *Wolfish* was clearly not intended to apply to the situation here:

> Respondent's reliance on other lower court decisions concerning minimum space requirements for different institutions and on correctional standards issued by various groups is misplaced.... The cases cited by respondents concerned facilities markedly different from the MCC. They involved traditional jails and cells in which inmates were locked during most of the day.... Thus, we need not and do not decide whether we agree with the reasoning and conclusions of these cases.

441 U.S. at 543–44 n. 27, 99 S.Ct. at 1867 n. 27.

The *Wolfish* Court recognized that "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment...." *Id.* at 542, 99 S.Ct. at 1875.[11]

In a post-*Wolfish* case involving overcrowding and time out of cell of pretrial detainees, this court found no due process violation. *Jordan v. Wolke,* 615 F.2d 749 (7th Cir. 1980). In *Jordan,* four pretrial detainees at the Milwaukee County Jail were housed in a cell measuring nine feet by ten feet (90 square feet). Inmates of five cells shared access to a corridor of 400 square feet and a dayroom of 335 square feet. The detainees were allowed in the corridor or dayroom sixteen hours a day. Because of the access of pretrial detainees to common areas for most of their waking hours, the *Jordan* court found the conditions similar to those in *Wolfish* and reversed the district court's injunction prohibiting the keeping of the detainees in these physical conditions:

> With respect to overcrowding, we do not see a material distinction between the facts in *Wolfish* and the facts in the case at bar. Here, as there, detainees are required to spend only the sleeping hours in their cells and, '[d]uring the remainder of the time, ... are free to move between their rooms and the common area.'
> ... Although the average floor space per inmate is apparently somewhat smaller here than in *Wolfish,* we do not think this difference can reasonably be viewed as a basis for distinguishing that case.

615 F.2d at 753.

The *Jordan* court further quoted *Wolfish* as referring to the cell as an "admittedly rather small sleeping space...." 615 F.2d at 753, quoting *Wolfish,* 441 U.S. at 543, 99 S.Ct. at 1876. The factual situation in this case is clearly distinguishable from those in *Wolfish* and *Jordan* because here the small cell is not merely a sleeping room but rather is the only place the pretrial detainees may be for the overwhelming portion of their waking and sleeping hours.

A further distinction between the present case and *Wolfish* and *Jordan* concerns the amount of time spent by pretrial detainees at the institution. According to the *Wolfish* Court, "of the unsentenced detainees, over half spent less than 10 days at the MCC, three-quarters were released within a month and more than 85% were released within 60 days...." 441 U.S. at 525 n.3, 99 S.Ct. at 1866 n.3. According to the Supreme Court, its determination that the conditions presented in *Wolfish* did not amount to punishment "is further buttressed by the detainees' length of stay at the MCC.... Nearly all of the detainees are released within 60 days." *Id.* at 543, 99

---

11. The *Wolfish* Court indicated that "loading a detainee with chains and shackles and throwing him in a dungeon" would probably be unconstitutional. *Id.* at 539 n.20, 99 S.Ct. at 1874 n.20. The Court doubtless did not intend to indicate that all treatment short of that would pass constitutional muster.

S.Ct. at 1876. In *Jordan*, the court concluded that the average length of stay of pretrial detainees in the Milwaukee County Jail was shorter than was true in *Wolfish* and that the crowding of cells "hardly results in punishment in view of the temporary nature of detention at the jail." 615 F.2d at 753. In the instant case, both parties agree that the average length of confinement is about sixty days.

The Court of Appeals for the Eighth Circuit, in a case decided since *Wolfish*, found unconstitutional the conditions of confinement of pretrial detainees. *Campbell v. Cauthron*, 623 F.2d 503 (8th Cir. 1980). The detainees in *Cauthron* were locked in cells twenty-four hours per day, with release only three times weekly for thirty minutes for exercise and showers. The cells measured 130 to 154 square feet and housed six to eight persons. The court concluded the crowded conditions and lack of time out of cell violated the due process rights of the pretrial detainees because they amounted to punishment. *Id.* at 507. The court ordered that no more than four persons be held in each cell if they were to be confined for more than sixteen hours daily. For detainees held more than a week, no more than three could be held in each cell. Daily recreation was mandated for each inmate. *Id.* In *Ramos v. Lamm*, 485 F.Supp. 122 (D.Colo.1979), the district court found the conditions of confinement to be unconstitutionally restrictive and ordered that "[n]o prisoner . . . may be housed in less than 80 square feet for 20 or more hours a day. If the confining space decreased from 80 square feet, the hours of confinement therein must be reduced proportionately." *Id.* at 170.

■ The prison officials here cannot justify the restrictive conditions imposed upon all safekeepers by referring to the officials' ignorance of the reasons these pretrial detainees are sent to the prison. There may be individual safekeepers who must be kept in very restrictive conditions, but that determination must be made upon facts about the individual safekeeper provided by the committing court or discovered by the pris-on's counseling staff. We find that the conditions of confinement amount to punishment of the safekeepers and thus violate their rights to due process because of the great length of time that each safekeeper, regardless of individual needs and circumstances, is currently required to spend in a small cell in the Indiana State Prison A & O Unit.

We have no hesitancy in concluding that confinement of these detainees in a prison maintained primarily for the purpose of punishment of convicted persons, under conditions more burdensome than those imposed on the general population of convicted felons, amounts to punishment under *Bell v. Wolfish*. In *Wolfish*, the Court noted that "there is no basis for concluding that pretrial detainees pose any lesser security risk than convicted inmates," and that in fact the detainees accused of serious crimes might constitute more serious risks than convicted inmates serving short terms. 441 U.S. at 546 n.28, 99 S.Ct. at 1878 n.28. Here on the contrary, the safekeepers are held at a maximum security prison, housing primarily felons including many serving sentences for life or for a long term of years. Granting that the state's interest in secure confinement of the safekeepers may justify confinement of particular detainees under restricted conditions because of their known characteristics, the additional severity of treatment in the absence of knowledge of their individual characteristics is clearly excessive and thus amounts to punishment under the *Wolfish* test. 441 U.S. at 538–39, 561, 99 S.Ct. at 1873–74, 1885.

It seems to us that a minimum requirement as to cell area should be imposed and this minimum should be determined flexibly in relation to the amount of time individuals are to be kept in the cell. In *Wolfish*, the Supreme Court found no constitutional bar to keeping two detainees in a seventy-five square foot cell for seven or eight hours daily. 441 U.S. at 543, 99 S.Ct. at 1876. The Court recognized that the same space might be unconstitutional if used for many more hours of confinement. Recognizing that institutional determinations as

to the detainees' and the prison's needs will result in differing programs and amounts of time out of cell for safekeepers, it will be appropriate for more space to be allotted to the detainees who are required to spend more time in cells. Except where individual circumstances show the need for more restrictive confinement, safekeepers should be allowed to spend significant periods of each day out of their cells and some activities or programs should be regularly available to them in their time out of cells.

The court's consideration of incidents of tear-gassing of pretrial detainees by prison officials demonstrates deficiencies in both the finding of facts and the application of relevant law. Evidence before the court indicated six separate instances of a guard's use of tear gas, sometimes involving more than one pretrial detainee. The court's opinion considered only two of those instances, those of June 25, 1975 and of October 11, 1975. The court's only reference to other incidents was the statement "In both of these incidents and every other incident involving the use of tear gas reasonable force was used." 464 F.Supp. at 555.

Use of tear gas by prison officials was governed by a manual of correctional policies [12] applicable to the Indiana State Prison. Although plaintiffs argued that the instances of use of tear gas violated the departmental policy, the district court did not refer to that policy in its discussion of tear-gassing. *Id.* at 554–55. On April 21, 1975, Captain Park indicated in a memorandum to the prison warden that he had that day sprayed gas at three safekeepers. While safekeeper Malo's gassing was allegedly in response to his refusing to hand over an 18-inch long piece of pipe, the other two men who were gassed were reported to

be doing no more than "hollering and threatening the officers." There is no indication that these safekeepers were outside of their locked cells. Another incident, while apparently not involving safekeepers, suggests that guards saw use of tear gas as an appropriate response to being cursed at. On December 14, 1975, according to Captain Hoover, "inmates Johnson # 37656 and Davis # 6831, were shouting obscenities. . . . They each were told at least three (3) times to quiet down and they refused and were gassed. . . ." One of the incidents specifically considered by the district court also involved verbal abuse by safekeepers to guards. Regarding the October 11, 1975 incident, Captain Hoover reported that "Carpenter SK–238 and Lock SK–220 were ordered by me to keep quiet while officers were shaking down on the south side of NSB. They refused and insisted on calling me an [obscenity]. They were gassed. . . ." In the other incident considered by the court, plaintiff Carpenter retained a metal food tray in his cell on June 25, 1975 and proceeded to bang it on the bars of his cell. Upon his refusal to give up the tray, he was gassed. Although correctional personnel denied that they intended to go into his cell to retrieve the tray and did not indicate that the tray could likely be used by Carpenter to harm others outside his cell, the court accepted the defense's contention that the tray was a weapon and that the use of tear gas was justified in order to remove the weapon from him.

The court properly cited *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.), *cert. denied sub nom. Employee-Officer John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973), for the proposition that prison officials violate due process upon making an

---

12. State of Indiana, Department of Correction, Volume 2, *Manual of Policies and Procedures, Section 1812, Policies and Procedures for Liquid Tear Gas* provides in part:

[Tear gas] may be used in such instances where a prisoner barricades or arms himself or cannot be approached without definite danger to personnel or to himself, and when it is determined that a delay of apprehension for a reasonable time would constitute a serious hazard to the inmate or other people or

result in a major disturbance or property damage.

.   .   .   .   .

Liquid tear gas should not be used in small rooms where there is no ventilation except in extreme cases, and then all personnel and inmates in the immediate area must be evacuated immediately; otherwise severe damage may result from prolonged inhalation of the gas.

unprovoked attack on a prisoner. It is not clear from the *Lock* opinion what provocation existed in each of the tear gas incidents to justify use of the gas on the pretrial detainee. As the trial court here recognized, Conclusion of Law 18, *Johnson* requires the court to consider several factors:

> In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

481 F.2d at 1033.

This court, in *Stringer v. Rowe*, 616 F.2d 993 (7th Cir. 1980), recently considered under what circumstances use of tear gas or other disabling chemical would be constitutionally impermissible: [13]

> [U]se of chemical agents such as tear gas and mace by prison officials to subdue individual prisoners, rather than to quell large disturbances, should be more restricted. *See, e. g., Spain v. Procunier*, 600 F.2d 189, 196 (9th Cir. 1979) . . .; *McCargo v. Mister*, 462 F.Supp. 813, 819 (D.Md.1978). . . .

616 F.2d at 919.

The court in *Spain* indicated that the "use of the substance,[tear gas] in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required." 600 F.2d at 195. The *McCargo* court ruled that "the use of such agents should be strictly limited to circumstances presenting the utmost degree of danger and loss of control." 462 F.Supp. at 819. The court concluded that only in rare circumstances would it be appropriate for tear gas to be used to control inmates already confined within their cells. *Id.*

■ The October 11, 1975 tear gassing of Carpenter and Lock was found to be needed under the circumstances then existing "to maintain and restore discipline and order," 464 F.Supp. at 555, and to be in a not unreasonable amount. Although the record demonstrates conflicting testimony about the amount of gas used, the appellant did not challenge that finding as clearly erroneous and we accept it as true. Testimony indicated that the safekeepers were engaged in inciting to riot at a time of tremendous tension in the prison following an attempted escape and the taking hostage of the prison warden and several others. We believe that the facts shown regarding this incident constitute one of the rare occasions when use of tear gas against persons locked in cells was not unjustified.

■ On the contrary, we find that the use of gas on June 25 to retrieve a metal food tray from safekeeper Carpenter was constitutionally impermissible. Although defense witnesses testified, and the court agreed, that the tray constituted a potential weapon, nothing in the record demonstrates how the tray could be used as a weapon as long as Carpenter was locked in his cell. Although we recognize that significant destruction of prison property by a person locked in a cell might justify the use of tear gas, we do not believe that the possible damage to the tray rises to that level.

■ Similarly impermissible was the use of gas on April 21 to stop safekeepers Hunt and Brown from shouting and uttering threats.

Plaintiffs Carpenter and Lock testified that several instances of tear gassing were in retaliation for their complaints about the conditions in which they were being held. The trial court heard their testimony and concluded that it "entertains serious reservation as to the credibility of these two

---

**13.** Although *Stringer* was concerned with treatment of convicted persons rather than with pretrial detainees and thus involved the Eighth Amendment rather than the Due Process Clause, it is relevant here because any action that would violate the Eighth Amendment as cruel and unusual punishment would obviously constitute punishment which may not be imposed upon pretrial detainees without violating their due process rights.

plaintiffs as witnesses in this case." 464 F.Supp. at 541. We of course accord great deference to determinations of credibility made by the trial court. In light of this credibility determination and of the disputed nature of testimony about the other claimed incidents of tear-gassing, we see no reason to disturb the trial court's determination that none of the other incidents represented violations of constitutional rights of the safekeepers.

█ The requirement of equal protection dictates, as appellees here agree, that pretrial detainees may not be treated less favorably than convicted persons, unless the difference in treatment is justified by a legitimate government interest. Brief of appellees at 43. As the Second Circuit indicated in *Rhem v. Malcolm*, 507 F.2d 333 (2d Cir. 1974), "The demands of equal protection of the laws and of due process ... prevent unjustifiable confinement of detainees under worse conditions than convicted prisoners." *Id.* at 336. *See also, Inmates of Suffolk Co. Jail v. Eisenstadt*, 360 F.Supp. 676, 686 (D.Mass.1973) *aff'd* 494 F.2d 1196 (1st Cir.), *cert. denied sub nom. Hall v. Inmates of Suffolk County Jail*, 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974); *Jones v. Wittenberg*, 323 F.Supp. 93, 99–100 (N.D.Ohio 1971), *aff'd sub nom. Jones v. Metzger*, 456 F.2d 854 (6th Cir. 1972); *Brenneman v. Madigan*, 343 F.Supp. 128, 138 (N.D.Cal.1972); *Seale v. Manson*, 326 F.Supp. 1375 (D.Conn.1971); *Tyler v. Ciccone*, 299 F.Supp. 684 (W.D.Mo.1969).

█ Appellees do not dispute the fact that the safekeepers in the A & O Unit are subject to significantly different and more restrictive conditions of confinement than those applied to the general prison population. Although the conditions of safekeepers on the A & O Unit appear substantially similar to the conditions of convicted prisoners on that unit, that similarity is insufficient to defeat plaintiffs' equal protection arguments. Absent a rational justification of the different treatment, there is a violation of equal protection when pretrial detainees are held in more burdensome conditions of confinement than convicted offenders in the same institution. The defendants argue that the safekeepers are held at the prison for much shorter periods of time than are the convicted felons and that the situation of the safekeepers justifies the different treatment. Defendants argue further that keeping the safekeepers in the A & O Unit is justified by the needs of keeping them separate from convicted persons, preserving internal order, and effectively managing the institution.

█ Plaintiffs in this action have not objected to their being kept in individual cells and significantly isolated from the general prison population. They have asserted that the prison officials were required to make more activities and programs available to them and to confine them less restrictively. The two groups of convicted prisoners held in the A & O Unit are subject to significant restrictions because of their status. It is justifiable that new prisoners are not let into institutional programs or placed in the general prison population until the process of classification has occurred. Prisoners selecting placement in the Unit, generally to avoid perceived dangers to themselves, also logically must be subject to significant restrictions. The very fact that the prison officials have not undertaken a classification process regarding the safekeepers or otherwise discovered their needs or their reasons for being sent to the prison makes it impossible for the prison officials to know what restrictions on each safekeeper are necessary to preserve internal order and effectively manage the institution. Although *Bell v. Wolfish* is clearly not based on an equal protection analysis, 441 U.S. at 579, 99 S.Ct. at 1895 (Stevens, J., *dissenting*), the *Wolfish* Court's holdings are still relevant to this question. The *Wolfish* Court held that "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of ... pretrial detainees. 'Central to all other correctional goals is the institutional consideration of internal security within the correctional facilities themselves.'" 441 U.S. at 546–47,

99 S.Ct. at 1877–78. We do not read anything in *Wolfish* as requiring this court to grant automatic deference to ritual incantations by prison officials that their actions foster the goals of order and discipline. Under the facts before us, we find that the safekeepers in this action have been denied equal protection of the laws by being held under significantly more burdensome conditions than convicted prisoners in the absence of any justification for such treatment of each individual.

Appellants complain of numerous instances in which safekeepers were subjected to disciplinary treatment, allegedly without observance of procedural due process. The district court made findings of fact, which are not challenged as clearly erroneous, about these instances. Findings of Fact 83, 86, 88, 92–94, and 97. The court concluded that discipline was imposed only in regard to plaintiff Carpenter's behavior on July 26, 1975 and that the requirements of due process were met in that instance. 464 F.Supp. at 554. We find no error in that conclusion.

Regarding visitation rights, the district court concluded that "[f]rom August 1, 1975 until the present there are no restrictions placed on a pre-trial detainee's visitation." *Id.* at 550. Prior to that time, the committing agency was required to approve the names of all visitors to a safekeeper at the prison. *Id.* We find no error in the district court's conclusion that the current visitation policy met constitutional requisites. We have considerable doubt whether the prior policy was constitutionally proper. It may well be that the defendants are immune from damages for any violation of constitutional rights under this policy. The practice has, however, ceased and under the circumstances we see no reason to make a definitive ruling on the issue.

The district court considered the plaintiffs' claims that they were denied adequate access to lawbooks and to counsel. It found that safekeepers could receive visits from counsel and had access for all but a brief time to materials in the prison writ room. *Id.* at 552. That temporary interruption of writ room service was found to be caused by the prison officials' reasonable belief that writ room personnel were supplying safekeepers with contraband; further, the court found that the custody personnel continued to supply safekeepers with writ room material during this period of time. *Id.* Although appellants' counsel argues numerous disputed facts rejected by the district court, she did not claim that any of the findings of the district court regarding access to attorneys or lawbooks was clearly erroneous and this court must take these findings of fact as true. We find no error in the district court's conclusion that there was no denial of the safekeepers' access to the courts.

Appellants apparently sought to have this court reconsider numerous factual disputes resolved by the district court, but it is not appropriate for us to do so in the absence of specific claims of clear error in the findings of fact made by the trial court. These questions include mail and telephone policies, access to showers, access to medical services, and loss of safekeepers' property.

▮ Prison officials receive qualified, not absolute, immunity from liability in a section 1983 damages suit. *Procunier v. Navarette*, 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978). This qualified immunity is determined by a two-part test, as described in *Navarette* :

> [I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with a good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct.

434 U.S. at 561–62, 98 S.Ct. at 859 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974)).

Prison officials are responsible for keeping themselves "sensitive and alert to the protections afforded prisoners by the developing judicial scrutiny of prison conditions and practices." *Knell v. Bensinger*, 522 F.2d 720, 725 (7th Cir. 1975). In order to determine whether the prison officials here had a reasonable belief in 1975 in the constitutionality of their actions, we must consider the state of the law as of 1975.

The district court found, and we see no reason to disturb this finding, that the officials' actions in this case were carried out in good faith and that "[o]n the basis of the total record there is a failure to prove intentional, wilful, malicious or deliberately indifferent conduct as to any defendant." 464 F.2d at 557.

Regarding the use of tear gas to stop safekeepers locked in cells from using abusive or threatening language directed toward prison guards, or to stop a safekeeper from banging a metal tray on the cell bars after refusing to hand the tray over to the guards, this court's opinion in *Stringer v. Rowe*, 616 F.2d 993 (7th Cir. 1980), recognized an evolution of judicial attitudes towards use of mace or tear gas against persons confined in correctional facilities. As the *Stringer* court indicated:

> In order to establish a violation of the Eighth Amendment, a plaintiff must show that prison officials intentionally inflicted excessive or grossly severe punishment on him or that the officials knowingly maintained conditions so harsh as to shock the general conscience. *United States ex rel. Miller v. Twomey*, 479 F.2d 701, 719–20 (7th Cir. 1973), *cert. denied*, 414 U.S. 1146, [94 S.Ct. 900, 39 L.Ed.2d 102] (1974). Courts have sanctioned the use of tear gas "when reasonably necessary . . . to subdue recalcitrant prisoners." *Clemmons v. Greggs*, 509 F.2d 1338, 1340 (5th Cir. 1975). *Recent decisions, however, have emphasized that use of chemical agents such as tear gas and mace by prison officials to subdue individual prisoners, rather than to quell large disturbances, should be more restricted.*

616 F.2d at 998–99 (emphasis added).

Although *Johnson v. Glick*, 481 F.2d 1028 (2d Cir. 1973) found unconstitutional an unprovoked attack on a prisoner with tear gas, nothing in that case would have clearly indicated that the behavior of the safekeepers here did not constitute the required provocation. Our study of cases involving use of tear gas convinces us that the prison officials involved here could, in 1975, have had a reasonable belief that their actions did not violate constitutional requirements. Nor does the department of correction's policy regarding tear gas lead us to a different conclusion. The literal terms of the policy appeared to have sanctioned the use of tear gas to remove the tray from a safekeeper, because the policy provides that tear gas "may be used in such instances where a prisoner . . . cannot be approached without definite danger to personnel . . . and where it is determined that a delay of apprehension for a reasonable time would . . . result in a major disturbance, or property damage." Conceivably the cursing by safekeepers might, as argued by the appellees, have led to "a major disturbance," and the correctional officers may have reasonably believed that the prisoners could not be approached without danger to themselves or others.

Appellant points to *Landman v. Royster*, 333 F.Supp. 621 (E.D.Va.1971). In *Landman*, the court found that tear gas had been used "to silence noisy, misbehaving men while confined in their cells." *Id.* at 649. The *Landman* court recognized the problem of officials being unable to isolate a misbehaving inmate "where his rantings will not disturb anyone," *id.*, but found an eighth amendment violation in "the use of tear gas to punish or control the non-threatening inmate." *Id.* The court in *Poindexter v. Woodson*, 357 F.Supp. 443 (D.Kan. 1973), *aff'd* 510 F.2d 464 (10th Cir. 1974), *cert. denied* 423 U.S. 846, 96 S.Ct. 85, 46 L.Ed.2d 68 (1975), rejected the *Landman* holding: "Nor will the Court accept the contention that the use of tear gas is justi-

**500**

fiable only to disperse men who are not confined in their cells, or to subdue an inmate, in or out of a cell, who possesses a firearm, and no other weapon. This simply is not a realistic restriction to place upon prison officials." 357 F.Supp. at 456. Another pre-1975 case prohibited use of tear gas in an institution for juveniles "except to the extent reasonably necessary to bring under control a riot that threatens imminent harm to human life or imminent and substantial destruction of property." *Morales v. Turman*, 364 F.Supp. 166, 176 (E.D. Tex.1973). We cannot conclude on the basis of these decisions that the use of tear gas here violated clearly established constitutional rights. As a result of this, and because of the finding of good faith which we do not disturb, we find defendants here immune from damages for the unconstitutional use of tear gas.

Similarly, we do not find that the courts had established as clearly unconstitutional the confinement of pretrial detainees under the circumstances present in the A & O Unit. Nor was it clear at the time that the requirement of equal protection was being violated by the prison officials. Accordingly, the defendants in this action are not liable for damages for these constitutional violations.

This court has found that the conditions of incarceration of safekeepers violate their rights to due process insofar as all safekeepers are arbitrarily placed in cramped cells for long periods of time each day without regard for the individual situation of each safekeeper. We have also found unconstitutional the use of chemical agents to stop unpleasant but not threatening behavior by safekeepers locked in their cells. Further, this court has found a violation of the right to equal protection of safekeepers *vis a vis* other prisoners in the Indiana State Prison. In this opinion, we have indicated that these practices may not, consistent with constitutional mandates, be continued in the future. The district court is directed to frame an injunction consistent with this opinion. In all other regards, the decision of the district court is affirmed.

AFFIRMED IN PART; REVERSED IN PART.