John V. NORRIS, Plaintiff,

v.

The DISTRICT OF COLUMBIA, et al., Defendants.

Civ. A. No. 82–1806.

United States District Court, District of Columbia.

July 26, 1985.

St. John Barrett, James H. Shelton, Washington, D.C., for plaintiff.

Janet Golup, Asst. Corp. Counsel, Washington, D.C., for defendants.

## MEMORANDUM

GESELL, District Judge.

Plaintiff sues the District of Columbia and three correction officers under 42 U.S.C. § 1983 (1982) claiming he was maced and beaten by the officers while at the D.C. Jail, without cause, in violation of his rights under the Fifth Amendment. Following dismissal by another Judge of this Court the case was remanded,[1] 737 F.2d 1148 (D.C.Cir.1984), and eventually was transferred to the undersigned. Pend-

---

1. The remand directed, among other things, that plaintiff be allowed "to engage in reasonable discovery directed towards proving his allegations that the District has 'failed adequately to supervise, train, instruct and control officers in the use of mace.' Amended Complaint at 3." *Norris v. District of Columbia,* 737 F.2d at 1152. Plaintiff acknowledged on the record prior to trial that he had been afforded such discovery.

ing defense motions to dismiss or for summary judgment were denied except as to defendants Barry and Palmer, who were dismissed, and all issues were considered in a full bench trial. The Court states below its findings of fact and conclusions of law.

Plaintiff, Norris, came to the D.C. Jail to await trial on January 14, 1982, and was assigned to the North Three area, awaiting classification. This area holds intake prisoners in a crowded dormitory section associated with a block of single cells one floor below. Norris was entitled to make a telephone call to his family. He wanted to do this but was never allowed to call, in spite of several requests of various guards and supervising custodians made over a three-day period. He became increasingly agitated and angry, felt he was being harassed by jail personnel and asked to be transferred to another section or to administrative segregation, also known as "the hole."

Around midnight on January 17, 1982, when a dormitory count was being taken, he refused to be present for the count and stood with his personal effects on the landing outside the dormitory. When the count was completed and he refused to return to the dormitory the two guards on foot duty, defendants Frizzel and Byrd, asked for the shift supervisor, Lt. Green, also a defendant, to come to deal with the situation. Green explained to Norris that he could only be transferred if he was willing to sign a request for protective custody, which Norris refused to do. After making inquiries, Green informed Norris that there were no cells available in other sections and suggested he proceed to cell 12, below, which was vacant. Norris was verbally aggressive, calling Green the usual litany of names but finally went down to the cell with Green and the two guards. No force was used. Norris went voluntarily.

At cell 12 there was no one in the corridor. The automatic opener for the cell door stuck and Green had to spend some time and effort to open it manually. Norris became more agitated. He refused to enter the cell when directed because the door would not work. Lt. Green shot a single, short burst of CS gas, commonly known as mace,[2] into Norris's lower face. The CS gas was shot from an aerosol canister held near Norris's chest to avoid shooting it directly into his eyes. The other two guards shoved Norris into the cell, he was handcuffed and then taken promptly to the infirmary following the routine practice in such cases to permit showering, washing of eyes and face and changing of clothing. All of the guards on duty at the time of the incident and Lt. Green filed formal reports on the incident. Norris was subsequently disciplined for his conduct after a prison disciplinary hearing.

None of the three officers involved beat or physically abused Norris. He received only the immediate temporary injury of irritation and burning sensation around his eyes. Norris hit an elbow on the wash bowl sink of the cell, presumably when shoved into the cell. The elbow was treated with Ben-Gay and the injury promptly subsided.

The Court cannot credit plaintiff's version of the incident. His claims of brutal physical force are inconsistent with his testimony on trial and infirmary records. The mace had no permanent effect. His eyes were not injured in any organic way. His glacoma and other eye problems well preceded the incident. He is claim-minded and has brought several suits on other matters against the District.

Green had had no prior contact with Norris. He used mace to control Norris when Norris resisted entering the cell. He did not use mace to punish Norris because of anything Norris had said or done previously. In Green's view it was proper to use mace in the circumstances under the rules, regulations and training he had received. Green was an experienced, highly trained officer, now promoted to Major. He has

---

**2.** Mace is a trade name that comprehends several chemicals, including CS gas, which is ortho- chlorabenzal-malonoitrile.

had extensive training in correctional matters, including the use of mace, wide correctional experience, and had taken advanced courses to supplement his practical experience. The two guards assisting him acted at his direction and did not even have mace to use since mace was only distributed to certain supervisors in the cell block.

Plaintiff seeks damages and injunctive relief. He alleges that the supervision and training of officers by the District of Columbia relating to the use of mace establishes an unconstitutional policy or practice sufficient to trigger its liability under § 1983. *See City of Oklahoma v. Tuttle*, — U.S. —, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). He also alleges that the three correctional officers involved in this incident are individually liable for depriving him of his due process rights under the Fifth Amendment in violation of 42 U.S.C. § 1983.

The policy and practice of the District of Columbia with respect to the use of mace at the time of the incident must be determined from a variety of proofs: the formal but necessarily general statements of policy, the precise procedures taught in regularly training, and the actual use as disclosed by mandatory incident reports obtained from the jail files. While this case concerns use of mace to control inmates in individual cell block situations, the formal policy is more broadly stated inasmuch as it covers a variety of circumstances that may arise throughout various facilities of the District's entire correctional complex.

The general policy was stated as follows:
... mace will be employed only after all other reasonable efforts, excluding physical force, to control individuals or situations have failed.[3]
Officers were regularly trained that non-deadly force, in the form of physical force

or chemical weapons, may be used to prevent escape, to prevent an act which might result in death or serious bodily injury, to prevent serious damage to property, to prevent or quell a riot, to prevent the commission of a misdemeanor, and to prevent or defend against a physical assault. They were also advised that non-deadly force could be used to enforce institutional regulations. The training materials emphasize, however, that "in *EVERY* case only the amount of force necessary to accomplish the task will be used."[4] The use of physical force or chemical agents as a form of punishment was expressly forbidden and nondeadly force was authorized only if oral or other nonforceful methods of persuasion were not effective.

Thus physical force and chemical agents are treated as equally acceptable alternatives when persuasion or minor laying on of hands, such as a guiding arm, proves unsuccessful. But the use of chemical agents was subject to special conditions which restricted and tended to inhibit their routine use. Only supervisors were authorized to carry and use mace. Supervisors carried a canister of CS gas which they were trained to use by firing the gas once, for a short interval (about one second), aimed below the eyes at chest level to avoid shooting the chemical directly into the eyes. Repeated use within a short period of time was prohibited unless there was substantial justification. Clear-cut guidelines required that persons exposed to the chemical agents receive immediate first aid. Inmates and guards exposed to the chemical were to be removed from the area and immediately referred to the medical staff. The medical staff provides a shower, water to flush the eyes and a complete change of clothing.[5] Supervisors who used mace were required to submit a formal written report on every incident of its use. Correctional officers were occasionally disciplined for misuse.

3. Plf. Ex. No. 15, Dept. Order 6011.1, September 27, 1972.

4. Plf. Ex. No. 20, Lesson Plan for training course on "Use of Force Doctrine."

5. Plf. Ex. No. 17.

Incident reports reflect a practice of use consistent with the policy in practically all instances. Many of the instances involve the use of mace in self-defense. Others involve situations where mace was apparently used to avoid physical contact with a resisting inmate who was acting in a threatening manner or was suspected to be dangerous if physical force was used.[6]

The incident reports also indicate that the use of mace at the jail was not routine. All of the reports on the use of chemical agents filed between July, 1976 and May, 1985 are in evidence. During this 107 month period, only sixty-six instances were reported.[7] The number of instances is so small that a heavy presumption exists that physical force, within limits, as opposed to mace, is the preferred means of controlling inmates at the jail.

Although the official policy of the D.C. Jail could have been articulated to jail guards with greater clarity, the Court finds that the policy at the time of this incident can be summarized as follows. Chemical and physical force were regarded as the means of last resort to control inmates at the jail. Punitive use of either type of force was specifically proscribed and grounds for discharge. When an inmate resists other methods of enforcing rules, supervisors had the discretion to choose between the use of physical force or the chemical weapon and this included the discretion to choose to use a chemical weapon rather than physical force when the supervisor believes that confronting or overpowering the inmate posed a possible threat of injury to guards or inmates. In practice, physical force tended to be the preferred

means of controlling inmates and the guidelines governing the use of chemical weapons are observed and monitored.

Plaintiff attacks this policy as unconstitutional based on two different theories. The first is that it authorizes the use of chemical weapons for summary punishment. The D.C. Jail's strict prohibition on punitive use entirely defeats this attack.

Plaintiff's second theory is that the use of chemical weapons for prison discipline is an "excessive," "undue" or "unjustified" use of force that "shocks the conscience" or "grossly exceeds that warranted by the circumstances." *Norris v. District of Columbia,* 737 F.2d at 1151–52 & n. 8.[8] Plaintiff contends that any use of chemical weapons to enforce jail regulations in the absence of an unequivocal danger of immediate bodily injury is an excessive, unconstitutional use of force. Thus he suggests that jail officials should be required to use physical force coupled with physical restraints, such as handcuffs, to control inmates unless an immediate and serious threat of danger has been established.

In support of this contention he presented an expert witness who gave general testimony concerning the possible dangerous effects of mace under certain circumstances and efforts of some correctional institutions to limit its use. The record indicates that the Federal Bureau of Prisons and some other correctional authorities may presently require a somewhat more restrictive use of chemical agents than that permitted in the D.C. Jail and encourage more use of decisive physical force to control inmates. *See* Federal Bureau of Pris-

---

**6.** Plf. Ex. No. 21.

**7.** There may have been a few unreported incidents, but the evidence before the court indicates that they were not significant in number and these reports represent virtually all of the incidents that occurred.

**8.** In evaluating whether a use of force is excessive or undue so that it violates due process, the Court is to be guided by the factors set out in *Johnson v. Glick,* 481 F.2d 1028 (2d Cir.) *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973):

In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm. *Id.* at 1033. *See Norris v. District of Columbia,* 737 F.2d at 1150.

ons, Use of Force and the Application of Physical Restraints on Inmates, 28 C.F.R. § 552.23 (1984).

Considerable discretion is involved under any prisoner control program. The Court does not have the power to require correction officials to adopt one policy as preferable over another unless it is compelled by the constitutional guarantees which § 1983 is designed to protect. A recalcitrant inmate must be controlled and, except in extreme instances, the Constitution does not dictate when a choice must be made between physical force as opposed to chemicals.

 No regulation can anticipate all the possible confrontations that may occur during a day in an overcrowded jail such as D.C. Jail. Jail and prison officials are "under an obligation to take reasonable measures to guarantee the safety of the inmates and of themselves." *Hudson v. Palmer*, — U.S. ——, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984). In setting constitutional limitations on how they are to accomplish this extraordinary, difficult and dangerous task, courts must be conscious of the pressures and conditions under which detention facilities operate. *See id.; Wolff v. McDonnell*, 418 U.S. 539, 561–62, 566, 94 S.Ct. 2963, 2977–78, 2980, 41 L.Ed.2d 935 (1974). Discretion must be exercised, often on hunch, in a short space of time. Danger to self, danger to the inmates, and the danger of loosing control of a situation are ever present. The responsibility for setting security policies is "lodged in the sound discretion of the institutional officials," and " 'proper deference to the informed discretion of prison authorities demands that they and not the courts make the difficult judgments which reconcile conflicting claims affecting the security of the institution, the welfare of the prison staff, and the property rights of detainees.' " *Block v. Rutherford*, — U.S. ——, 104 S.Ct. 3227, 3232, 82 L.Ed.2d 438 (1984), *quoting, Bell v. Wolfish*, 441 U.S. 520, 557 n. 38, 99 S.Ct. 1861, 1884 n. 38, 60 L.Ed.2d 447 (1979). The due process clause does not prohibit reasonable responses to the problems of jail security or require administrative officials to adopt the least restrictive means of maintaining control of their facilities. *Block v. Rutherford*, 104 S.Ct. at 3234 n. 10. Nor does due process clause authorize courts to second-guess the reasonable policy judgments delegated to prison administrators. *See Hewitt v. Helms*, 459 U.S. 460, 467–68, 103 S.Ct. 864, 869–70, 74 L.Ed.2d 675 (1983).

Modern penology approves use of chemical weapons to control inmates under closely supervised conditions as an alternative to the use of excessive physical force. In certain situations, the use of mace to control an inmate may be safer and more effective than risking a physical confrontation. *See Soto v. Dickey*, 744 F.2d 1260, 1262–63 (7th Cir.1984). The security system at the D.C. Jail contains all the appropriate safeguards and proper use of chemical weapons is enforced by constant training and monitoring by reporting requirements.

In weighing the appropriateness of making chemical weapons available to supervisors if physical force is necessary to control an individual inmate it should be recognized that D.C. Jail guards and supervisors carry no blackjack, batton or other weapon and function in a highly volatile, overcrowded atmosphere. They are grossly outnumbered, often by a ratio of 50 or 100-to-1 where most inmates are not held in individual cells. Given the variety of situations that may suddenly arise, no written policy can precisely define just when and how personnel should act in choosing between a need for force between muscle and mace. Given all the related rules limiting the availability and use of mace, the strictures against its misuse and the reporting and medical treatment requirements, the policy of the D.C. Jail appears to adequately restrict the discretion of supervisors to use the chemical.

Before the policy can be sustained, the Court must be satisfied that mace in the form of CS, if used as prescribed, is not reasonably likely to cause serious or lasting injury. Mace is used in the context of

individual inmate control by ejecting a single, one-second liquid burst in the direction of the lower face from about two feet away. CS causes, in the language of its supplier, "extreme temporary discomfort": in the form of stinging and burning sensation.[9] The effects only last a matter of minutes and are relieved by prompt washing when the mace is used as contemplated. Given these limited effects, the Court cannot find that the District's policy on the use of mace in less than extreme circumstances such as that presented here constitutes an excessive use of force. There was no proof presented to support such a claim.

Other courts that have examined the constitutional limitations on the use of mace have reached similar conclusions. In *Spain v. Procunier*, 600 F.2d 189 (9th Cir. 1979), the Ninth Circuit vacated a district court order that restricted the use of tear gas to cases of actual or imminent threat of serious damage or a riot. In discussing the constraints which the Eighth Amendment places on the use of chemical weapons, the court found that the use of dangerous quantities should be restricted to "grave circumstances which would justify the use of severe and potentially lethal force." *Id.* at 195. But with respect to nondangerous amounts:

> [U]se of the substance in small amounts may be a necessary prison technique if a prisoner refuses after adequate warning to move from a cell or upon other provocation presenting a reasonable possibility that slight force will be required. In these circumstances the substance may be a legitimate means for preventing small disturbances from becoming dangerous to other inmates or the prison personnel.

*Id.* The court concluded that "where there are safeguards to insure that tear gas is not used in dangerous quantities we think its use can be justified in situations which are reasonably likely to result in injury to persons or a substantial amount of valuable property...." *Id.* at 196.

The Fourth Circuit adopted a similar position in *Bailey v. Turner*, 736 F.2d 963 (1984), in upholding a jury verdict against an inmate who had brought a § 1983 claim after being maced in his cell. The court stated that the use of mace is not *per se* unconstitutional and its use must be evaluated based on the totality of the circumstances, the provocation, the amount of gas used, and the purposes for which it was used. *Id.* at 969. After quoting the conclusions of the Ninth Circuit in *Spain v. Procunier*, the court concluded that "review both of the authorities of this circuit as well as of other circuits makes it abundantly clear that the use of mace on an unruly or 'recalcitrant' prison inmate, though confined in his cell, is not plainly unconstitutional," and using a single bursts of mace, for non-punitive purposes, is not an unconstitutional use of force. *Id.* at 969–71.

Finally, the Seventh Circuit has also adopted the view of the court in *Spain v. Procunier*. In *Lock v. Jenkins*, 641 F.2d 488 (7th Cir.1981), the court held that the use of tear gas to stop pretrial detainees from shouting and uttering threats or to retrieve a food tray from an inmate locked in his cell was constitutionally impermissible, but the use of a not unreasonable amount against detainees who were locked in their cells and trying to incite a riot was justified. *Id.* at 496–97. More recently, the Seventh Circuit emphasized the limits of its holding in *Lock v. Jenkins* when it reversed a district court ruling that imposed extremely restrictive conditions on the use of chemical agents against inmates in *Soto v. Dickey*, 744 F.2d 1260 (7th Cir. 1984). The court observed that the options available to correctional officers in enforcing orders against recalcitrant inmates are often limited to chemical agents or physical force. A realistic consideration of the conditions in detention facilities and deference to the judgment of penal authorities led the court to conclude that

> [T]he use of nondangerous quantities of the [chemical] substance in order to pre-

9. Def. Ex. No. 6.

vent a perceived future danger does not violate 'evolving standards of decency' or constitute an 'unnecessary and wanton infliction of pain.' We think that its use can be justified in situations which are reasonably likely to result in injury to persons or a substantial amount of valuable property. [*Spain v. Procunier,*] 600 F.2d at 196.

*Id.* at 1270.

■ This case does not involve the use of dangerous or excessive amounts of chemical agents. Nor does it involve the use of mace to inflict punishment. It involves the use of mace as an alternative to the use of physical force when other means of controlling the inmate have proven futile. A policy authorizing such use is not unconstitutional. The Court holds that the District of Columbia was not at the time of the incident pursuing a policy or practice as to the use of chemical weapons that violated the Fifth Amendments insofar as mace was permitted to be used under certain conditions to control or restrain individual inmates as an alternative to the use of physical force.

■ Plaintiff's claims against the individual defendants also must fail. Lt. Green used mace in good faith, exercising the discretion given him under the policy of the D.C. Jail. It was not his intent to punish or to retaliate against plaintiff because he had been called vulgar names. He had no basis for believing his actions were unauthorized or contrary to the Constitution. Throughout his extensive career and advanced training as a correction officer he was repeatedly given to understand that mace could be used as an appropriate restraint in lieu of physical force that might endanger himself, the inmate or others. In the past he had been knifed, he had been thrown down stairs by obstreperous inmates.

Lt. Green's use of mace on the plaintiff may have been unnecessary to effect the needed restraint. Yet, physical force had been used, greater injury to Norris and the guards might have occurred. If hindsight in the deliberate atmosphere of the court-room years later opens the possibility that plaintiff's intransigence in refusing to enter his cell could have been resolved without mace, this does not mean that the supervisor's decision on the spot was so indiscreet or lacking in basis that inferences of malice or gross negligence must be made. Highly trained career officers with long experience must be granted some leeway to act within areas of this assigned discretion without having such judgment second-guessed and their employer held responsible. Lt. Green is clearly entitled to qualified immunity and the Court so holds. *See Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

The claims against the two other guards who acted under Lt. Green's orders and who neither used nor encouraged use of mace or excessive physical force must also be dismissed for failure of proof. Moreover, Norris wholly failed to show an excessive use of force on the part of Lt. Green. Lt. Green's patient, deliberate and conscientious effort to assist plaintiff and to work out his problem, which is not disputed, is wholly inconsistent with the plaintiff's claim that Green was provoked to take retribution immediately thereafter for the constant name calling that interspersed the conversation. There had been no prior dealings between the two men leading to a long-standing grudge. Plaintiff was angry, tense, frustrated, volatile, and as such presented an uncertain aspect which signaled a need for caution and concern for safety in the early morning hours when events occurred. There is no evidence of any prior occasions where Lt. Green had used mace improperly or heedlessly, no evidence he has ever brutalized an inmate, no evidence he lacked training. While the contemporaneous reports of the other guards substantially corroborate Lt. Green, even if these are ignored the Court must credit Green's version over that of plaintiff.

### Equitable Relief

■ Plaintiff seeks an elaborate, detailed comprehensive injunction governing future use of chemical weapons in the entire D.C. correctional system. While there

may be need to perfect in somewhat more explicit written terms of the D.C. policy dealing with use of chemicals in differing situations, this case does not provide the appropriate vehicle for such an undertaking. It is not a class action. There is no threat that Norris will be treated differently than anyone else. There is absolutely no proof that would enable the Court to develop the parameters of such sweeping relief. Plaintiff has failed to make out a case of any injury. Written rules have since been agreed upon in a subsequent suit by way of settlement of a case assigned to Judge Jackson involving chemicals. Pl.Ex. No. 19. Equitable relief must be and hereby is denied.

The Clerk of Court is directed to enter judgment for defendants on all claims.