Alvin. JORDAN et al.,
Plaintiffs-Appellees,

v.

Michael S. WOLKE, etc., et al.,
Defendants-Appellants.

No. 78–2648.

United States Court of Appeals,
Seventh Circuit.

Argued April 25, 1979.

Decided Jan. 8, 1980.

---

Gerald G. Pagel, Corp. Counsel, Milwaukee, Wis., for defendants-appellants.

George R. Edgar, Legal Action of Wisconsin, Milwaukee, Wis., for plaintiffs-appellees.

Before SWYGERT, Circuit Judge, MOORE, Senior Circuit Judge,* and TONE, Circuit Judge.

TONE, Circuit Judge.

This is an appeal from an injunction prohibiting overcrowding of pretrial detainees at the Milwaukee County Jail and requiring that they be allowed contact visitation with family members.  After the case had been briefed and orally argued, we postponed our ruling to await the decision of the Supreme Court in *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).  Following that decision the parties filed written position statements with respect to its effect on the case at bar.  Having considered those statements, we conclude that the principles announced in *Bell v. Wolfish* govern this case and require reversal.

---

* The Honorable Leonard P. Moore, Senior Circuit Judge of the United States Court of Appeals for the Second Circuit, is sitting by designation.

Plaintiffs sue on behalf of themselves and other persons who are or will be incarcerated as pretrial detainees in the Milwaukee County Jail under conditions that are alleged to violate their due process and equal protection rights under the Fourteenth Amendment. Of the conditions challenged in the complaint, only overcrowding and denial of contact visitation remain at issue. The district court determined that the action was maintainable on behalf of the class with respect to those issues.

A preliminary injunction expanding visiting opportunities at the jail was reversed in part by an unpublished order of this court entered in August 1978 on the ground that the record was then insufficient to justify the requirements imposed with respect to contact visitation. *Jordan v. Wolke*, 7 Cir., 593 F.2d 772.

After a trial on remand, the district court entered a permanent injunction which, *inter alia*, requires that detainees be permitted contact visitation and prohibits confinement of more than two detainees in a single cell or confinement in quarters not providing each detainee with at least forty-five square feet of cell area. The defendant county officials appeal from these parts of the injunction order. Provisions of the order expanding the frequency of visitation opportunities and permitting longer visits are not complained of on appeal.

### Overcrowding

The jail houses an average of 315 persons, 80 percent of whom are pretrial detainees. Approximately 45 percent of all inmates remain in the jail for less than eleven days and only five percent for over thirty days. The multiple occupancy facilities complained of are eleven cellblock complexes, each housing twenty persons and consisting of five cells (four inmates to a cell), a corridor running along the front of the cells, and a connecting day room. Each cell measures nine feet by ten feet and contains two double bunk beds, a toilet, and a sink. The corridor measures eight feet by fifty feet. The day room contains 335 square feet. The area per inmate in each cellblock complex is thus fifty-nine square feet. The

inmates are locked in their cells from 10:00 P.M. to 6:00 A.M., but during the remaining sixteen hours of the day are permitted to be anywhere in the common areas of the cellblock complex. Television is provided. There is no claim of lack of proper sanitation or any other condition not inherent in the space limitations.

Under the injunction issued by the district court, each existing cellblock would provide 118.5 square feet per inmate, counting the corridor and the day room. This total far exceeds the American Correctional Association's standard for existing multiple occupancy cells, which, according to an expert called by plaintiffs, is fifty square feet per inmate in the cell area and thirty-five square feet in a separate day room, a total of eighty-five square feet. The evidence showed recommendations of other correctional experts, however, that would not be satisfied by the conditions the injunction required.

### Contact Visitation

The visiting facilities at the jail are so arranged that the inmate and his visitors are separated by a plexiglass window, and they must talk through a power phone. The district court's injunction requires the construction of visiting facilities that will permit contact visitation, *i. e.*, visitation "without separation by wall or partition." The facilities are to be "arranged so as to provide pretrial detainees and their visitors a reasonable degree of vocal but not visual privacy." Compliance would require not only construction of new visitation facilities but the hiring of additional guards.

### Bell v. Wolfish

At the time the district court rendered its decision, the applicable standard was provided by *Duran v. Elrod*, 542 F.2d 998, 999–1000 (7th Cir. 1976):

[A]s a matter of due process, pre-trial detainees may suffer no more restrictions than are reasonably necessary to ensure their presence at trial. . . . Since they are convicted of no crime for which they may presently be punished, the state must justify any conditions of their con-

finement solely on the basis of ensuring their presence at trial.

Despite this seemingly categorical statement, we also recognized in *Duran* that the state had an interest in maintaining "the security of the institutions" and avoiding "unreasonable expenditures." *Id.* at 1000.

In an effort to reconcile these administrative interests with the liberty interests of pretrial detainees, the Second Circuit held that "pretrial detainees may be subjected to only those 'restrictions and privations' which 'inhere in their confinement itself or which are justified by compelling necessities of jail administration.'" *Wolfish v. Levi*, 573 F.2d 118, 124 (2d Cir. 1978) (quoting *Rehm v. Malcolm*, 507 F.2d 333, 336 (2d Cir. 1974)), *rev'd sub nom., Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

The Supreme Court granted certiorari in *Wolfish* "to consider the important constitutional questions raised by" the Second Circuit decision "and to resolve an apparent conflict among the circuits." 441 U.S. at 524, 99 S.Ct. at 1866. The Court cited a number of decisions in the circuits which adopt varying standards, among them our decision in *Duran v. Elrod, supra.* 441 U.S. at 524 n.2, 99 S.Ct. at 1866 n.2.

Only one of the two challenged conditions of confinement involved in the case at bar, overcrowding, was at issue in *Bell v. Wolfish.* In deciding that issue adversely to the pretrial detainees, the Court declared that the following federal constitutional standards controlled conditions of confinement for pretrial detainees:

■ The due process clause does not impose the "compelling necessity" requirement enunciated by the Second Circuit.

When only the due process clause and not an express guarantee of the Constitution is involved, "the proper inquiry is whether . . . [the conditions of confinement] amount to punishment of the detainee" in a constitutional sense. 441 U.S. at 535, 99 S.Ct. at 1872–73. Neither "[l]oss of freedom of choice and privacy" nor interference "with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement" amount to punishment. *Id.* at 537, 99 S.Ct. at 1873. Rather, the question is "whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* Absent an "expressed intent to punish," the answer to that · question "generally will turn on '[w]hether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *Id.* at 538, 99 S.Ct. at 1873–74 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963)).[1]

■ Insuring a detainee's presence at trial is not the only legitimate governmental purpose that may justify a condition of confinement. In addition, "the effective management of the detention facility once the individual is confined is a valid objective that may justify imposition of conditions and restrictions of pretrial detention and dispel any inference that such restrictions are intended as punishment." *Id.* at 540, 99 S.Ct. at 1875. The following illuminating footnote deserves special mention:

In determining whether restrictions or conditions are reasonably related to the government's interest in maintaining se-

---

1. The complete list of criteria in *Kennedy v. Mendoza-Martinez* which the Court in *Bell v. Wolfish* quoted and described as "useful guideposts in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word," is as follows:

Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of

scienter, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned . . . . 372 U.S. at 168–69, 83 S.Ct. at 567–568 (quoted at 441 U.S. at 537–38, 99 S.Ct. at 1873).

curity and order and operating the institution in a manageable fashion, courts must heed our warning that "[s]uch considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to those considerations, courts should ordinarily defer to their expert judgment in such matters."

*Id.* at 540–41 n.23, 99 S.Ct. at 1875 n.23 (quoting *Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)).

*Application of Bell v. Wolfish to this Case*

██ Applying the foregoing standards to the case at bar, it appears clear to us that neither the alleged overcrowding nor the denial of contact visitation in the Milwaukee County Jail amounts to "punishment" in a constitutional sense. With respect to overcrowding, we do not see a material distinction between the facts in *Wolfish* and the facts in the case at bar. Here, as there, detainees are required to spend only the sleeping hours in their cells and, "[d]uring the remainder of the time, . . . are free to move between their rooms and the common area." 441 U.S. at 543, 99 S.Ct. at 1876. Although the average floor space per inmate is apparently somewhat smaller here than in *Wolfish*, we do not think this difference can reasonably be viewed as a basis for distinguishing that case.[2] The facilities here were designed for the number of occupants they now contain, and, while that design is not generous with space, it hardly results in punishment in view of the temporary nature of detention at the jail. In *Wolfish*, the Court said that its conclusion that the crowding complained of did

not violate the Constitution was "further buttressed by the detainees' length of stay at the . . . [detention facility]. Nearly all of the detainees are released within 60 days." *Id.* In the case at bar, the average length of stay seems to be shorter than it was in *Wolfish*. *See* 441 U.S. at 524–25 n.3, 99 S.Ct. at 1866 n.3. Although the Court in *Wolfish* was speaking of double bunking rather than quadruple bunking,[3] its conclusion is instructive for the case at bar:

> We simply do not believe that requiring a detainee to share toilet facilities and this admittedly rather small sleeping space with another person for generally a maximum period of 60 days violates the Constitution.

*Id.* at 543, 99 S.Ct. at 1876.

██ For similar reasons we believe that the denial of contact visitation by the authorities who operate the Milwaukee County Jail does not constitute punishment in a constitutional sense. Plaintiffs' sole complaint is that detainees are not allowed physical contact with visitors during the relatively brief periods of their detention. Although the Court in *Wolfish* did not address the issue of contact visitation, *id.* at 559–60 n.40, 99 S.Ct. at 1885 n.40, it did chart the path on which analysis must proceed. First, that prohibition of contact visitation is not intended by the defendants as punishment is undisputed. Second, the prohibition is rationally related to the legitimate purpose of preserving prison security and order. As the Supreme Court said, the authorities "must be able to take steps to maintain security and order at the institution and make certain no weapons or illicit drugs reach detainees." *Id.* at 540, 99 S.Ct.

---

**2.** Here, as in *Wolfish*, the plaintiffs' reliance on the opinions of correctional experts concerning the desirable amount of floorspace for multiple occupancy cells is misplaced. "[W]hile the recommendations of these various groups may be instructive in certain cases, they simply do not establish the constitutional minima; rather, they establish goals recommended by the organization in question." 441 U.S. at 544 n.27, 99 S.Ct. at 1876 n.27.

**3.** Justice Rehnquist, after noting that there was not "some sort of 'one man, one cell' principle lurking in the Due Process Clause," did state that "confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause." 441 U.S. at 542, 99 S.Ct. at 1875. Here, as in *Wolfish*, however, "nothing even approaching such hardship is shown." *Id.* at 542, 99 S.Ct. at 1875–76.

at 1874. Finally, the prohibition of contact visitation is not "excessive in relation to the . . . purpose" of maintaining security and order. *Id.* *Wolfish* itself sustained the validity of highly intrusive "body-cavity" searches of detainees that· were performed as a matter of course after each contact visit. In approving these searches, the Court noted that an alternative to their use would be to "abolish contact visits altogether." *Id.* at 560 n.40, 99 S.Ct. at 1885 n.40. The Court thus recognized the dilemma of prison authorities. Some method must be employed to assure that weapons, drugs, and other kinds of contraband do not enter the jail. Where contact visitation is permitted, the Supreme Court has found it permissible to conduct body-cavity searches. Where no contact visitation is permitted, the searches are unnecessary.[4] Neither alternative is so clearly preferable to the other that a court is warranted in substituting its judgment for that of "the persons who are actually charged with and trained in the running" of detention facilities. *See id.* at 560, 99 S.Ct. at 1886. Thus, under the standards prescribed in *Wolfish*, the Constitution was not offended.

The judgment is reversed with respect to overcrowding and contact visitation. With respect to matters not raised in this appeal, the judgment is of course left intact.

REVERSED.

SWYGERT, Circuit Judge, dissenting.

Even applying the standards laid down in *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), which we must, the district court's judgment should be affirmed. In my opinion the housing conditions in the Milwaukee County Jail violate the detainees' due process rights. Additionally, I believe the blanket denial of contact visitation constitutes punishment under the *Wolfish* standard.

I

With respect to the overcrowding issue the facts in *Wolfish* and in the case at bar are vastly different. In order to demonstrate these differences clearly, the respective circumstances are contrasted in parallel columns below.

| Metropolitan Correctional Center, New York City | Milwaukee County Jail |
| --- | --- |
| 1—The MCC is made up of living units composed of individual rooms primarily for sleeping which radiate from a central common room. Each unit houses twenty detainees, two to a room. | 1—The Milwaukee facility has traditional cells in units of five, all connected to an outer corridor leading to a "day" room. Each unit houses twenty detainees, four to a cell. |
| 2—Each MCC room has a total floor space of 75 square feet, or 37½ square feet per occupant. | 2—Each Milwaukee cell has a total floor space of 90 square feet (9' × 10'), or 22½ square feet per occupant. |
| 3—Two detainees are assigned to a single private room with a double bunk. | 3—Four detainees are assigned to a single cell with two double bunks. The cells cannot be used for any purpose other than lying in a bunk if another occupant is present. |
| 4—Aside from the individual rooms, the detainees have access during the day to a "common" room with recreational and exercise equipment, telephones, color television sets, books, food preparation center and dining facilities, and a visiting room. | 4—Aside from the cells the detainees have access during the day to a connecting corridor leading to a "day" room, containing a table and a television set. The detainees are confined to their cell blocks except for two hours per week for recreation and visiting. |

"The MCC differs markedly from the familiar image of a jail; there are no barred cells, dank, colorless corridors, or clanging steel gates. It was intended to include the more advanced and innovative features of modern design of detention facilities." *Bell v. Wolfish,* 99 S.Ct. at 1866. In contrast, the Milwaukee facility is a traditional jail with barred cells, amid a stark surrounding. The factual differences outlined above serve to distinguish this case from *Wolfish.* In that case the Supreme Court recognized that the ameliatory features at the MCC required a result that might not be justified when considering conditions found in traditional jails. Mr. Justice Rehnquist wrote:

Respondents' reliance on other lower court decisions concerning minimum space requirements for different institu-

---

4. *Cf.* Justice Powell's separate opinion in *Wolfish,* 441 U.S. at 563, 99 S.Ct. at 1886.

tions and on correctional standards issued by various groups is misplaced.

\*　　\*　　\*　　\*　　\*　　\*

The cases cited by respondents concerned facilities markedly different from the MCC. They involved traditional jails and cells in which inmates were locked during most of the day. Given this factual disparity, they have little or no application to the case at hand. Thus, we need not and do not decide whether we agree with the reasoning and conclusions of these cases.

*Bell v. Wolfish*, 99 S.Ct. at 1876 n.27.

The record here permits no doubt about the egregious effect of the excessively cramped space provided for the detainees of the jail and the double-double bunking. It is not disputed that the smallness of the quarters prevents adequate exercise and other activities during waking hours. This in turn tends to bring about tensions and aggressiveness and violence among the detainees. Moreover, it is not improper to speculate that the housing situation in the Milwaukee County Jail also has a coercive effect on detainees, prompting them to enter precipitous guilty pleas.

For all these reasons I believe the record demonstrates that the living conditions at the Milwaukee jail are punitive as that term has been defined and expanded in *Wolfish*. The detainees are subjected to severe privations and hardships. The legitimate purpose of secured confinement can be achieved in less cruel ways. But alternative humane housing is not being provided by Milwaukee County simply because it will cost money. The defendants admit as much when they say:

> To reduce the 55 four-man cells to two-man, would mean the defendants would have to find placement for 110 pretrial inmates. The jails surrounding Milwaukee County will not house these inmates. For the defendants to hold them in custody will require expensive changes in the construction of or remodeling of other facilities.

Costs should not, however, be balanced against constitutional violations.

## II

The issue of contact visitation was not presented to the Supreme Court in *Wolfish*. But, as Judge Tone notes, the issue must be answered in the light of that case. Again, I regretfully find myself in disagreement with my Brothers.

It is important to put the matter in concrete form. For that reason the following testimony of plaintiff Alvin Jordan is set forth:

> Q. During your confinement to the Milwaukee County Jail, Mr. Jordan, did you receive visits from persons outside of jail?
>
> A. Yes.
>
> Q. During these visits were you allowed to have physical contact with these visitors?
>
> A. No.
>
> Q. During these visits, would you be separated by any type of physical barrier?
>
> A. Yes.
>
> Q. Briefly describe that barrier.
>
> A. The barrier was the steel wall that was, I guess that would be to the northeast side of the jail, or north side of the jail; there was a steel wall where the entrance is and it's got a two glass slots in; let's see, there are six glass slots altogether, and there is a grille-work under the glass slots where the person can talk to you and you can see the visitor, but you can't talk with him. If you look at him, conversation is stopped; if you talk with him, then you can't see him because you have to bend to the grille to hear the conversation, there is no barrier between.
>
> Q. Did the presence of a physical barrier have any effect upon you?
>
> A. Well, certainly.
>
> Q. Will you please describe it?
>
> A. Well, I didn't feel too comfortable by seeing my visitor by not having, not being able to, say, touch them or hold hands or hug them or anything like that, or give them a kiss or not, you know. I didn't feel too good about that.

The record does not stop there. Two experts in the correctional field testified for plaintiffs. They agreed that there is a psychological need for detainees to have as much contact as possible with their families and friends. Dr. Thomas Murton explained:

The less one removes an inmate or . . . an offender from his normal social contacts, the less difficulty there is in moving him back through that tunnel into the normal society. . . . So, it has been generally found that where contact visits are allowed that inmate morale is better, that there is more likelihood of maintaining familial ties, that relationships with children are greatly enhanced.

The other expert, Joseph Cannon, confirmed this view. He said that detainees need to maintain as much as possible their relationship with their families. I cannot improve on the overall appraisal of the experts' testimony as it is set forth in plaintiffs' brief:

The need for support and love during a time of intense apprehension which jailing creates can be supplied by the ability to touch a loved one, to talk together unseparated by physical barriers or to speak directly without having to use a telephone. The quality of a contact visit allows for the fundamental relationship between a detainee and his family to be continued in a humane and effective way.

Experts' testimony in other cases reaffirms this evaluation. For example, Judge Lasker in *Rhem v. Malcolm*, 371 F.Supp. 594, 602 (S.D.N.Y.), *aff'd*, 507 F.2d 333 (2d Cir. 1974), referred to the testimony of Dr. Karl Menninger:

Dr. Karl Menninger, the psychiatrist of national renown who has studied and written about prison conditions over a long lifetime, deplored noncontact visits as "the most unpleasant and most disturbing detail in the whole prison," and described them "as a violation of ordinary principles of humanity . . . ." As Dr. Menninger put it: ". . . the one great thing that he [the inmate] can look forward to is the reestablishment, con-

tact, with this world. Because everybody lives constantly with a lot of contacts established, with you, them, with the judge, with the grocer and so forth. These have all been broken for this man."

"Now, this makes for a dangerous state of instability, because without these contacts he can't live psychologically."

\* \* \* \* \* \*

Dr. Menninger's conclusion was that the MHD's visiting system amounted to "dangling a fragment of meat in front of a dog and jerking it away . . . ."

The judge also referred to the testimony of another expert, Dr. August F. Kinzel, who had served as the staff psychiatrist at the United States Medical Center for prisoners at Springfield, Missouri. Dr. Kinzel agreed with Dr. Menninger that the MHD's visiting system caused severe prisoner frustration. He pictured it ". . . like the carrot on a stick that is held in front of the person who can't quite attain it . . . ." *Rhem v. Malcolm*, 371 F.Supp. at 603.

Finally, we should not write off the determinations of the trial judge in the case before us:

While recognizing that there may be some validity to the defendants' claim that contact visitation poses a security risk, on balance I believe that such risk may be minimized by carefully screening pretrial detainees and their visitors for contraband. This conclusion is supported in the record by two of the plaintiffs' experts, who testified that contact visitation programs for pretrial detainees do not pose a threat to the security of a facility which is not controllable by reasonable security methods. Moreover, the testimony of the chief of security at the Waupun state prison must be contrasted with the fact that the prison, which holds only convicted prisoners, has had a contact visitation program for fourteen years; in that time, there is no record of an escape or of a weapon ever having been passed as a result of the program. Thus, I do not believe that the alleged threat to the security of the Milwaukee county jail, posed by contact visitation,

justifies the current blanket prohibition on such visitation.

460 F.Supp. 1080, 1084 (E.D.Wis.1978) (citations omitted).

Against this background the blanket denial of contact visitation at the Milwaukee County Jail is punishment under the standard laid down in *Wolfish*. It is an excessive restriction of detainees' rights that does not bring about any additional security for the jail. It is unwarranted by any legitimate state concerns. And by any measurement, it is punitive because it deters the effective maintenance of fundamental relationships. If, in an individual situation, non-contact visitation is required for security reasons, the warden should have that discretion. But the invocation of a blanket denial because it reduces costs and eases administrative burdens is no defense to due process violations.

I foresee the time when those who are charged with crime but unable to furnish bail will be afforded more humane treatment than that provided at traditional jails such as Milwaukee. Federal courts, obeying constitutional norms, have led the way in that direction. Unfortunately, this court today has taken a step backward.