Leonard CAMPBELL, et al., Plaintiffs,

v.

Anderson McGRUDER, et al.,
Defendants.

Civ. A. No. 1462–71.

United States District Court,
District of Columbia.

Oct. 8, 1982.

See also 416 F.Supp. 100, and 416 F.Supp. 106.

J. Patrick Hickey, Shaw, Pittman, Potts & Trowbridge, Washington, D.C., for plaintiffs.

Edward E. Schwab, Asst. Corp. Counsel for the Dist. of Columbia, Washington, D.C., for defendants.

MEMORANDUM AND ORDER

BRYANT, District Judge.

A.

This case is before the court on remand from the United States Court of Appeals. *Campbell v. McGruder,* 580 F.2d 521 (D.C. Cir.1978). It concerns the conditions under which inmates are confined by the Department of Corrections of the District of Columbia (the Department). The plaintiffs in this case are all pre-trial detainees. Most of them are housed at the Department's Central Detention Facility (Central), which is also used for convicted persons awaiting sentencing, for sentenced felons awaiting transfer to other facilities, and for sentenced misdemeanants serving their sentence.

On September 22, 1982, the Department moved the court to vacate its order of March 8, 1982. That order in pertinent part prohibited the Department from confining more than one person in any cell at Central. On September 22, 1982, the court heard arguments on the motion to vacate. Prior to that hearing, the court visited Central.

The Department conceded that confining two inmates in a cell designed for one person (double-celling) is undesirable from the standpoint of both prison management and inmate well-being. But the Department

asked the court to permit double-celling as a temporary measure to relieve overcrowding at Central. Central was designed to hold 1,359 inmates. At the present time, the inmate population at Central exceeds 2,000 and is growing at an average rate of over nine inmates per week. To cope with this overcrowding, the Department has set up makeshift dormitories in some of the day rooms and gymnasiums at Central. Almost one-third of the inmates are currently living in these dormitories.

The Department offered two justifications for resorting to double-celling at Central. The first was that dormitories cannot be adequately patrolled and therefore pose a severe security risk. Though reliable statistics were not produced at the hearing, the Department asserted that the level of inmate assaults has increased at Central due to the use of dormitories. The second justification was that double-celling would enable the Department to remove dormitory beds from dayrooms and gymnasiums and use these facilities to provide inmates with needed recreational opportunities.

The Department acknowledged that the introduction of double-celling at Central would itself create problems. These include the need for special security arrangements to enable guards to oversee activities within the cells, the need for the proper matching of cellmates, and the need for removal of the existing single beds, which are welded to the cell walls. The Department also acknowledged that hostility and resentment might develop between inmates forced to share cells and those permitted to remain in single cells. More generally, the Department agreed that double-celling places a heavy burden on inmates. Despite these acknowledged problems, the Department failed to provide the court with specific plans for how it proposed to administer double-celling at Central.

## B.

The constitutional standards regarding the confinement of pre-trial detainees were set down by the Supreme Court in

*Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1978). The basic requirement, mandated by the Due Process Clause, is that pre-trial detainees must not be subjected to conditions that "amount to punishment". *Id.* at 535, 99 S.Ct. at 1872. The Court held that double-celling does not by itself amount to punishment:

> We disagree with both the District Court and the Court of Appeals that there is some sort of "one man, one cell" principle lurking in the Due Process Clause of the Fifth Amendment. While confining a given number of people in a given amount of space in such a manner as to cause them to endure genuine privations and hardship over an extended period of time might raise serious questions under the Due Process Clause as to whether those conditions amounted to punishment, nothing even approaching such hardship is shown by this record. [*Id.* at 542, 99 S.Ct. at 1875–76 (footnote omitted).]

As the above-quoted paragraph indicates, whether double-celling amounts to punishment in a particular case is a question of degree which must be determined according to the facts of each case. *Wolfish* dealt with conditions at the Metropolitan Correctional Center (MCC) in New York City. In reaching the conclusion that double-celling of pre-trial detainees was permissible at MCC, the Court focused on four factors: (1) that MCC was a modern facility built according to the most progressive architectural designs, (2) that each cell contained about 75 square feet of floor space, (3) that the detainees were confined in their cells only from 11 p.m. to 6:30 a.m., and (4) that nearly all the detainees were released within 60 days.

The importance of these four factors—facility design and age, cell size, hours per day of double-celling, and length of pre-trial detention—was underscored by the recent decision of the United States Court of Appeals in *Lareau v. Manson,* 651 F.2d 96 (2d Cir.1981).[1] In scrutinizing the conditions of

1. Further support concerning the importance of

these factors is provided by other circuits

confinement at the Hartford Community Correctional Center (HCCC), the Court of Appeals closely tracked the factual inquiry used in *Wolfish*. The court found that HCCC, like MCC, was a modern facility, but one built according to traditional architectural models. Cells at HCCC contained 60 to 65 square feet of floor space, 10 to 15 square feet less than those at MCC. At HCCC, unlike MCC, inmates often spent most of their day confined in their cells, in some cases as much as 23 hours per day. Moreover, due to the conversion of common areas into dormitories, inmates at HCCC had few recreational opportunities. The statistics regarding length of detention at HCCC presented a mixed picture. Over 73% of the inmates were confined for periods of less than 30 days, but at any one time more than 67% had been confined for periods in excess of 60 days. The court also noted that HCCC suffered from a number of problems not present in *Wolfish*. These included the conversion of dayrooms into crowded dormitories (the so-called "fish-tank"), the mixing of sick and healthy inmates, and the use of floor mattresses to double up single cells.

On this record, the Second Circuit ruled that double-celling of pre-trial detainees was permissible at HCCC. But given the greater hardships imposed on pre-trial detainees at HCCC as compared with MCC, the court placed a number of conditions on the use of double-celling. The "fishtank," the intermingling of healthy and sick inmates, and the use of floor mattresses were all prohibited. Furthermore, the administrators of HCCC were prohibited from dou-ble-celling pre-trial detainees for more than 15 days.[2] To go beyond that limit, the court concluded, would involve "unacceptable punishment." *Id.* at 105.[3]

### C.

■ Guided by the criteria used in *Wolfish* and *Lareau,* the court now turns to the question of whether double-celling may be used at Central, and, if so, under what conditions. Central is a modern facility, having been opened as a replacement facility for the old D.C. Jail during the course of this litigation. Like HCCC and unlike MCC, it is designed along traditional lines. In each cell block, a centrally located guard is stationed under a bubble. From this vantage point, the guard commands a clear view of the corridors of the cell block and a partial view of the dayrooms and gymnasium. Significantly, however, the guard cannot see into the individual cells. The size of the cells at Central is 70 square feet, more than at HCCC, but less than at MCC. Unlike the inmates at MCC, the inmates at Central presently spend at least 17 hours of each day confined in their cells. If, as not infrequently happens, the daily "count" is delayed, inmates spend even longer periods of time in their cells, and apparently the Department has given no thought to reducing these hours if allowed to go to double-celling. The Department was unable to produce accurate information regarding the average length of detention for pre-trial detainees at Central, but the uncontroverted evidence produced by the plaintiffs was that the average time between arrest and verdict or dismissal is 220 days (about seven

---

which have scrutinized conditions of pre-trial confinement in light of *Bell v. Wolfish. Littlefield v. Deland,* 641 F.2d 729 (10th Cir.1981); *Lock v. Jenkins,* 641 F.2d 488 (7th Cir.1981); *Campbell v. Cauthron,* 623 F.2d 503 (8th Cir. 1980); *Jordan v. Wolke,* 615 F.2d 749 (7th Cir.1980). None of these cases, however, provides as close a parallel to the conditions at Central as does *Lareau v. Manson.*

2. The Court of Appeals indicated that it would permit HCCC administrators to exceed the 15-day limit by two or three days in the case of detainees certain to be released within that time.

3. Judge Friendly, who dissented from the part of the court's decision which placed a 30-day limit on the double-celling of convicted inmates, concurred with the limitations placed on the double-celling of pre-trial detainees. In his discussion of double-celling, Judge Friendly noted that the harmful effects of this practice could be reduced if the time cellmates spent in their cell was arranged so that each inmate had the cell to himself during part of the day. *Id.* at 114 n. 7.

months) for those charged with felonies and 109 days (nearly four months) for those charged with misdemeanors. There does not appear to be a significant variation in these statistics according to whether the defendants are free on bond or held in detention.

In deciding whether double-celling may be used at Central, the court is mindful that prison administrators must be given wide-ranging discretion in dealing with the security problems of their institutions. At the same time, the court recognizes its constitutional responsibility to ensure that pre-trial detainees are not confined under conditions amounting to punishment. Fortunately, in the present case the court is not called upon to choose between the expert advice of prison administrators and the mandate of the Due Process Clause. Like the courts in *Wolfish* and *Lareau,* the Department has concluded that the destructive potential of double-celling can be brought within acceptable limits if detainees are not double-celled for long periods of time and if otherwise favorable conditions are maintained at the jail.

The Department's acting director testified that he "would rather not see that [double-celling] happening" because "each individual person would like to have his territory, even though he is in jail". The acting director further testified that double-celling "doesn't necessarily have to be [dehumanizing] if you try to handle it well .... When you are talking about classifying people, ... you make the best match of people in the various cells ... and give them time out of the cells and recreation and all the things that we are supposed to be doing that we are not doing.... That takes some of the inhumanity away from this kind of situation." At other points in his testimony, the acting director acknowledged that to properly administer double-celling would require the use of additional guards to patrol the cell blocks. He also emphasized that double-celling ought to be used as a temporary measure only.

In light of this testimony, the court will defer to the Department's judgment that double-celling is a lesser evil than the continued use of makeshift dormitories at Central. The court will also defer to the Department's judgment concerning the factors that are necessary to the proper administration of double-celling. In order to protect inmates from being assaulted while locked in their cells, the court will require that additional guards be placed in each cell block in which inmates are double-celled. These guards will patrol the cell block corridors on a frequent enough basis to closely monitor activities within the individual cells. The total number of guards on duty in the cell blocks must exceed that presently employed to patrol the cells and dormitories.

To make specific the Department's recommendation that inmates be given adequate time out of their cells, the court will require that no inmate be double-celled for more than 12 hours per day. A detainee may be confined in his cell for more than 12 hours per day, but only if his cellmate is removed from the cell for a sufficient length of time to reduce the total hours of joint confinement to less than 12 hours in any day. Furthermore, in line with the decisions reached in *Wolfish* and *Lareau,* the court will order that no pre-trial detainee be double-celled for more than 30 days. In *Wolfish,* nearly all the detainees were released within 60 days. In *Lareau,* the court imposed a 15-day limit on the double-celling of pre-trial detainees. On the basis of the salient factors already discussed, the court finds that conditions at Central are somewhat better than at HCCC, but worse than at MCC. The 30-day limit reflects Central's intermediate position on this continuum.

These preconditions to double-celling are imposed in order that pre-trial detainees not be unlawfully confined under conditions amounting to punishment. They mark minimal standards, and merely meeting them should not give rise to satisfaction or complacency.

It is clear from the testimony that the Department views the use of double-celling with considerable misgivings. In this nega-

tive judgment the Department is joined by virtually all expert opinion in the field. The reason for this unanimous condemnation of double-celling is that, unless administered under optimal conditions, it poses a substantial risk of dehumanizing and punishing the inmates. It was in order to avoid this risk that Central, along with almost every other modern jail, was designed to accommodate only one person in each cell.

The imposition of double-celling will inevitably place new pressure on the individual inmates at Central and on the institution as a whole. The court's restrictions on the use of double-celling will act as relief valves to bleed off some of this pressure. But the court notes in passing that foreseeable increases in the inmate population at Central will soon close off these relief valves. As the percentage of double-cells at Central increases, it will become more and more difficult for the Department to rotate detainees out of the double-cells within 30 days. Similarly, as the number of prisoners using the dayrooms, gymnasiums, and other common areas grows, it will become more difficult for the Department to separate cellmates for 12 hours a day. As the pressure mounts, the Department will once again find itself confronted with an overcrowding crisis. As a matter of fact, it appears that the time is fast approaching when the Department will be unable to comply with any constitutional standard. This could lead to results that none of us want to even contemplate.

At an earlier point in this litigation, this court observed that: "... More energy is devoted to pointing up excuses than to creative efforts to deal effectively with a problem which obviously is here and is not going away of its own accord—the new Jail notwithstanding." *Campbell v. McGruder,* 416 F.Supp. 111, 114–115 (D.C.1976). Though well aware of the difficulties faced by the Department and the local government, the court continues to believe that these difficulties can be surmounted with long-range planning and continual monitoring of the shifts in inmate population. The question of pre-trial detainees is an important aspect of the criminal justice system. Those responsible for the orderly administration of that system cannot afford to expend all their ingenuity and effort on measures which foreseeably exacerbate the problem of pre-trial detainees. Some of that creative energy must be reserved for improving conditions of confinement and for reducing the numbers of people confined pending trial—thus avoiding the constitutional issues confronted here. This will require an innovative and aggressive approach.

But it is possible, and there really is no alternative.

It is hereby ORDERED that the portion of the court's order of March 8, 1982 prohibiting the double-celling of pre-trial detainees is vacated, and it is

FURTHER ORDERED that:

(1) Additional guards be placed in each cell block in which inmates are double-celled. These guards are to make frequent inspections of the inside of the individual cells.

(2) No pre-trial detainee be confined in his cell for more than 12 hours in any day in the company of another inmate.

(3) No pre-trial detainee be double-celled for more than 30 days.