**David Wayne HARDAWAY and Laura Le Beck, Plaintiffs,**

v.

**Larry D. KERR, Warden, and Armen Wedell, Correctional Counselor, Defendants.**

No. 82–C–853–C.

United States District Court, W.D. Wisconsin.

Oct. 19, 1983.

Paul R. Norman, Madison, Wis., for plaintiffs.

Sheree Gowey, Asst. U.S. Atty., Madison, Wis., for defendants.

CRABB, Chief Judge.

In this civil action, plaintiffs seek to enjoin defendants from enforcing a prison policy denying visitation between former volunteers and inmates allegedly contrary to the First and Fifth Amendments. Plaintiffs have moved for a preliminary injunction preventing the defendants from refusing to allow visitation between the plaintiffs pending trial on the merits of this case.

From the affidavits of plaintiffs Hardaway and Beck, and Father Daniel Kelly, the depositions of defendants Kerr and Wedell and associate warden L.L. Ketchum, and defendants' answers to interrogatories, I find the following as fact, for the purpose only of deciding this motion.

### FACTS

Plaintiff David Wayne Hardaway is incarcerated at the Federal Correctional Institution in Oxford, Wisconsin. Plaintiff Laura Le Beck, whose maiden name is Laura Le Mead, currently resides at 2087 Colony Court, Apartment A, Beloit, Wisconsin.

Defendant Larry Kerr. has been the warden at FCI–Oxford since January 1981. Defendant Armen Wedell has been a correctional counselor at FCI–Oxford since February 1981.

Hardaway has been an inmate at FCI–Oxford since June, 1981. He had previously been incarcerated at federal penal institutions in Texas and Indiana and has been confined in jails or prisons continuously since January, 1980. During this period, he received three visits from persons other than Beck or his attorneys; a pastor visited him once in May 1982 regarding a Bible study course and a woman visited him twice in September and November 1982 in conjunction with a religious organization he had joined. Hardaway did not know these visitors before he was in prison and he does not regard these visitors as friends. Hardaway has no family or friends other than Beck who are likely to visit him during the remainder of his confinement.

Prior to his incarceration, Hardaway had briefly met Beck in the Chicago area in connection with Beck's counseling of Hardaway's niece.

In June, 1981, Beck and her husband began participating as volunteers in a Monday night Bible study program at FCI–Oxford. Hardaway began attending the Monday night Bible study program in July,

1981. A friendship developed between plaintiffs Beck and Hardaway and they began meeting individually at the beginning and end of each program. In November, 1981, Father Daniel Kelly, Chaplain at FCI–Oxford, advised Hardaway that he had been spending too much time with Beck during the Bible study program. In January, 1982, Father Kelly again spoke with Hardaway about spending too much time with Beck. He advised Hardaway that either Beck would be asked to stop coming to the study program or Hardaway would have to stop participating in the Bible study group. Plaintiffs Beck and Hardaway discussed the matter and decided Beck should cease coming to the institution as a volunteer. They both assumed that she could be added to Hardaway's visiting list.

In early February, 1982, Beck ceased participating as a volunteer at the institution. On January 26, 1982, Hardaway applied to have Beck's name put on his regular visiting list. Pursuant to this application, a form was sent to Beck to be completed before the application could be processed. Beck completed this form and returned it to the institution. After discussing the matter with Father Kelly and other institution officials, defendant Wedell, Hardaway's correctional counsel, denied the application on March 9, 1982. Defendant Wedell based his decision on two policy statements: one forbids volunteers from switching to an inmate's visiting list; the other states that overly friendly relationships should not develop between volunteers and inmates.

Institutional guidelines, which outline volunteers' responsibilities at FCI–Oxford, state:

> No volunteer ... should ever become overly friendly with any inmate to the point that you could be used. This does not imply that you cannot be friendly with inmates. To the contrary, we encourage such. However, you must be extremely careful not to allow such friendships to progress to where it would weaken your ability to adhere to your responsibilities or contribute to either misconduct or the appearance of misconduct.

Oxford Institution Supplement OXF–5300.-9, dated July 14, 1981. The reasons for this "overly friendly" rule are stated within the policy statement.

The institution has developed an additional policy, which states: "There will be no switching of group participants to an inmate's visiting list, or from an inmate's visiting list to a group activity." Oxford Institution Supplement OXF–5381.1C, dated August 25, 1981. This policy is designed to deter volunteers and inmates from violating the "overly friendly" rule. If a volunteer becomes overly friendly with an inmate and is asked to cease volunteer participation at the institution, that volunteer is prohibited from visiting the inmate on an individual basis. A secondary goal of this policy is to prevent financial and emotional exploitation of volunteers by inmates. The institution never intended this policy to serve a security function.

When she applied to be added to Hardaway's visiting list, Beck's name was still on the volunteer visiting list. Soon thereafter, her name was removed from the institution's volunteer list.

In correspondence concerning the denial of visitation privileges, prison officials indicated that the decision was based, in part, on the fact that Beck was married. Prison officials suggest that this fact is relevant to their decision for several reasons: to avoid becoming a party to divorce proceedings, to avoid sanctioning extra-marital relationships, and to shield Beck from influences that could upset her marital relationship. Beck's husband did not object to her attempts to visit Hardaway. Since her service as a volunteer, Beck has separated from her husband and is obtaining a divorce.

In June, 1982, Hardaway again applied to have Beck's name added to his visiting list, but this time he used her maiden name, Laura Le Mead. At this time, Beck had separated from her husband and was using both her married and maiden names. Pur-

suant to this application, another form was sent to Beck, addressed to her as Laura Mead. Beck completed this form and returned it to the institution.

During this period, Hardaway was approached by his new correctional counselor, Joseph Kopach, and was asked whether the proposed visitor, Laura Mead, had previously been a volunteer at the institution and was the same person as Laura Le Beck. Hardaway lied to Kopach about Beck's identity. Thereafter, the application was approved and Beck was allowed to visit Hardaway at the institution three times during the months of August and September, 1982. In mid-September, 1982, when Beck came to the institution to visit Hardaway a fourth time, Wedell and another institution official asked her whether she was Laura Le Beck, the former volunteer. Beck answered in the affirmative. The officials then advised her that she could not visit Hardaway. She reacted in a nonviolent, respectful manner.

Upon discovering that Hardaway had lied to his counselor, prison officials disciplined Hardaway for lying. It is not the prison's policy to take visiting privileges from an inmate for providing a false statement to a staff member. However, on occasion, prison officials have pointed to the lie as further support for the denial of plaintiffs' visitation rights.[1]

During October, 1982, Hardaway requested an administrative determination of his right to receive visits from Beck. Defendant Kerr denied the request for an administrative remedy because of the prison policy against visitation between former volunteers and inmates. For further support of his denial, Kerr pointed to the overly friendly relationship that developed between Beck and Hardaway, in violation of prison policy.

Subsequently, Hardaway appealed the denial of an administrative remedy. The Regional Director of the Federal Bureau of Prisons upheld the denial. He suggested that there is a reasonable basis for the prison policy against visitation between former volunteers and inmates: to prevent exploitation of volunteers and disruption of prison volunteer programs. He found further support for his position from the evidence that Beck and Hardaway conspired to provide false information to institution officials in order to obtain visitation rights.[2]

The defendants did not consider the rehabilitative impact of Beck's visits in their decision to refuse to allow such visits. Although Beck made several efforts to discuss with institution officials the reasons why she believed her visits with Hardaway would be beneficial to his rehabilitation, institution officials have refused to meet with her for that purpose. The defendants did not base their denial of visitation rights on any contention that Beck is a security

---

1. Also, defendants have suggested that Hardaway has a pattern of emotional involvement with female volunteers at the prisons at which he has been institutionalized. They referred to an involvement with a female organist at FCI-Oxford who was asked to stop coming to the institution because of a personal relationship with Hardaway and to an asserted reason for his transfer from a previous institution based on his involvement with a woman there. However, defendants state that this alleged pattern of emotional involvement with female volunteers is not the reason for denying the visitation requests; the denial is based solely on the visitation policy.

2. On September 29, 1982, Hardaway requested from institution officials permission to marry Beck. This request was denied on October 7, 1982. Kerr upheld this denial summarily in his response to Hardaway's request for an administrative remedy. In the appeal, the regional director expanded on this position by stating the prison policy:

> The current policy on marriage indicates that approval will ordinarily be confined to those instances where a marriage was planned prior to incarceration and was prevented by intervening circumstances, where there are children involved, or where other compelling reasons exist. Also, marriages ordinarily would not be authorized near the beginning or end of a sentence, and you have not asserted that as one of the bases for achieving reversal.

Response to Administrative Appeal of G. Wozniak for G.A. Ralston, Regional Director, November 3, 1982. In this action, the plaintiffs are not challenging the denial of permission to marry.

risk or a threat to the good order of the institution.

Other volunteers have been allowed to visit individual inmates while they have been participants in religious programs at the prison. Prison officials defer to Father Kelly, the institution chaplain, in allowing such deviations from the policy.

Institution officials have indicated that they will continue to deny visitation rights to the plaintiffs based on the prison policy.

Hardaway may be released from the institution as early as August, 1985.

## OPINION

In order to obtain a preliminary injunction, plaintiffs must show: 1) a reasonable likelihood of success on the merits; 2) a significant threat of irreparable harm if the injunction is not granted or an inadequate remedy at law; 3) that the threatened injury to the plaintiff outweighs the threatened harm the injunction may inflict on the defendants; and 4) that issuance of the injunction will not disserve the public interest. *Wesley-Jessen Division of Schering Corp. v. Bausch & Lomb Inc.*, 698 F.2d 862, 864 (7th Cir.1983); *O'Connor v. Board of Education of School District No. 23*, 645 F.2d 578, 580 (7th Cir.), *cert. denied*, 454 U.S. 1084, 102 S.Ct. 641, 70 L.Ed.2d 619 (1981). A district court must consider and weigh each of these factors in determining whether to grant a preliminary injunction.

### 1. Reasonable Likelihood of Success on the Merits

In this case, the plaintiffs allege that the defendants' continuing refusal to allow them visitation rights deprives them of rights guaranteed by the First and Fifth Amendments. The plaintiffs challenge the institution's policy that forbids a volunteer from being placed on an inmate's visiting list and the application of the policy in this case.

When Beck first sought to be added to Hardaway's visitation list, she was acting as a volunteer at FCI–Oxford and her name was on the volunteer or group participant list. Since that time, she has ceased all volunteer activities at the institution and her name has been removed from the volunteer list. Therefore, the only constitutional issues before this court are those concerning the policy forbidding a former volunteer from visiting an individual inmate and the application of that policy to the plaintiffs; the question whether a person can be both a volunteer and a visitor of a particular inmate is not at issue in this case.

### A. First Amendment Claim

It has long been established that maintenance of institutional security and order in prisons are legitimate governmental interests that may require retraction of retained constitutional rights of prisoners. *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). However, prison inmates retain those First Amendment rights that are consistent with prisoner status or with legitimate penological objectives of the corrections system. *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). In evaluating challenges of prison restrictions inhibiting First Amendment interests, courts must analyze the restriction in relation to the following legitimate penological goals: 1) deterrence of crime—presumably most people would find confinement in a penal institution undesirable, which would deter them from engaging in criminal behavior; 2) rehabilitation of inmates; and 3) internal security. *Id.* at 822–23, 94 S.Ct. at 2804. The goal of maintaining institutional security is paramount to all other legitimate penological objectives. *Id.* at 823, 94 S.Ct. at 2804. The Supreme Court has deferred to the judgment of corrections officials in establishing a visitation policy that limited only one of several means of communication by an inmate. *Pell v. Procunier*, 417 U.S. at 827, 94 S.Ct. at 2806. "So long as reasonable and effective means of communication remain open ..., we believe that, in drawing such lines [between the legitimate governmental interest in prison security and legitimate policy objectives of corrections systems], 'prison offi-

cials must be accorded latitude.' " *Id.* at 826, 94 S.Ct. at 2806, quoting *Cruz v. Beto,* 405 U.S. 319, 321, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972); *accord Jordan v. Wolke,* 615 F.2d 749 (7th Cir.1980). Even before the Supreme Court's pronouncement, the Court of Appeals for the Seventh Circuit applied a similar analysis: "The proper standard for consideration of the regulation or practice which restricted the right of free expression that a convicted person ... would have enjoyed if he had not been convicted of a crime is that the State must show on challenge that such restriction is related both reasonably and necessarily to the advancement of a justifiable purpose of imprisonment." *Morales v. Schmidt,* 494 F.2d 85 (7th Cir.1974) (en banc); *accord Morales v. Schmidt,* 489 F.2d 1335, 1343 (7th Cir.1973), *reh'g en banc,* 494 F.2d 85 (7th Cir.1974). *See also Hamilton v. Saxbe,* 428 F.Supp. 1101, 1111 & 1112 (N.D.Ga.1976), *aff'd sub nom. Hamilton v. Bell,* 551 F.2d 1056 (5th Cir. 1977) (per curiam); *Mabra v. Schmidt,* 356 F.Supp. 620, 636 (W.D.Wis.1973).

■ The Supreme Court has recognized a constitutional interest in face-to-face communication, *Pell v. Procunier,* 417 U.S. at 823, 94 S.Ct. at 2804, holding, however, that a restriction of one of many channels of communication is less restrictive of First Amendment rights than a ban on all forms of communication. Accordingly, in assessing the constitutionality of particular limitations on face-to-face visitation, *id.* at 823–24, 94 S.Ct. at 2804–05, the availability of alternative means of communication must be considered.

In *Pell v. Procunier,* the Supreme Court was reviewing a prison policy prohibiting face-to-face press and media interviews with specific inmates. In addressing the visitation policy limiting face-to-face visits to family members, to friends of prior acquaintance, to legal counsel, and to clergy, the Court acknowledged:

In the judgment of the state correctional officials, this visitation policy will permit inmates to have personal contact with those persons who will aid in their reha-

bilitation, while keeping visitations at a manageable level that will not compromise institutional security. Such considerations are peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters.

*Id.* at 827, 94 S.Ct. at 2806.

In *Pell v. Procunier,* inmates' constitutional rights to face-to-face communication with the press and media received limited protection because the same information could be communicated through alternative means and because the prison allowed inmates to have personal face-to-face visitation with those persons who will aid in their rehabilitation. *Id.* at 827, 94 S.Ct. at 2806. In this case, the defendants are preventing precisely that type of visitation the Supreme Court agreed was likely to contribute to an inmate's rehabilitation.

Both the Bureau of Prisons and FCI–Oxford have recognized the positive effects of face-to-face visitation between inmates and their families and friends. The Bureau of Prisons has a policy encouraging "visiting by family, friends, and community groups to maintain the morale of the inmate and to develop closer relationships between the inmate and family members or others in the community." This policy also provides that, "The Warden shall develop procedures consistent with this rule to permit inmate visiting." Bureau of Prisons Program Statement 5267.3, dated July 1, 1980.

The Bureau of Prisons policy further provides:

For Security Level 1–3 Institutions: The visiting privilege shall ordinarily be extended to friends and other non-relatives, unless visits could reasonably create a threat to the security and good order of the institution;

For Security Level 4–6 Institutions and administrative institutions: The visiting privilege shall ordinarily be extended to friends and associates having an estab-

lished relationship prior to confinement, unless such visits could reasonably create a threat to security and good order of the institution. Exceptions to the prior relationship rule may be made, particularly for inmates without other visitors, when it is shown that the proposed visitor is reliable and poses no threat to the security or good order of the institution.

Pursuant to this policy, FCI–Oxford has developed visiting regulations. "It is the policy of this institution to encourage inmate visiting to develop and maintain healthy family and community relationships. Visits are an important factor in maintaining the morale of the individual offender and motivating him toward positive goals." OXF–5267.1C, dated June 11, 1981.

In this case, the plaintiffs assert that face-to-face visitation would have beneficial effects on Hardaway's rehabilitation. Because their decisions were based on the prison policies relating to volunteers, none of the prison officials at FCI–Oxford considered whether visitation between the plaintiffs would have a positive effect on such rehabilitation efforts. Nevertheless, it is probable that visitation between the plaintiffs would be consistent with the objectives behind the overall prison policy regarding inmate visitation in that it would encourage Hardaway to maintain a personal relationship with a friend, it would improve Hardaway's morale, and it would serve as a motivating force towards positive rehabilitation goals. Prison officials might contend that the relationship between Hardaway and Beck is not the sort of "healthy" relationship sought to be encouraged through visitation. However, I understand that the prison officials would have denied the plaintiffs' visitation request if Beck's divorce had been final or if she had never been married. Therefore, any challenge to the "healthiness" of plaintiffs' relationship must focus on the fact that it originated in a prison volunteer program.

The stated purpose behind the prison policy forbidding the transfer of a volunteer to an inmate's personal visitation list is twofold: first, the policy is designed to protect volunteers from financial and emotional exploitation by inmates; second, the policy is aimed at protecting the efficacy of volunteer programs. The policy is designed to achieve the second goal by deterring inmates and volunteers from becoming overly friendly with each other in volunteer programs. If a volunteer becomes overly friendly with an inmate, not only will he or she be required to cease participating in prison volunteer programs, but he or she will also be forbidden from visiting the individual inmate.

Institution officials never intended this policy to serve a security function. Although one prison official asserted that if volunteers become overly friendly with inmates, they may be more likely to smuggle contraband into the institution, he conceded that this risk is no greater than with visitation by friends or family members, unless, perhaps, the visitor remains a volunteer and has greater access to the institution than does an ordinary visitor. Presumably, once the visitor ceases participating in volunteer programs, he or she will no longer have the additional opportunity the volunteer may have had to provide the inmate with contraband. In this case, plaintiff Beck is not challenging any of the restrictions imposed by the prison on persons who may visit inmates or the manner and amount of visitation allowed. Rather, Beck seeks to visit Hardaway subject to all the normal restrictions on individual visitation with inmates.

Defendants have not argued that the prison policy prohibiting visitation between former volunteers and inmates is necessary to further the legitimate penological objective of deterrence which is served by confining prisoners in an institutional setting with restrictions on their freedoms. Defendants must show that this particular restriction is reasonably and necessarily related to the advancement of rehabilitation goals or some other legitimate penological goal. Defendants point out that volunteer programs in prisons advance rehabilitation

goals of the institution and that responsible volunteers dedicated to the purpose behind the volunteer programs help these programs serve the prisoners in ways that may contribute to their rehabilitation. Defendants contend that a volunteer who becomes overly friendly with an inmate is less able to function as an effective volunteer than a volunteer who does not become personally involved with an inmate. Assuming that this contention is accurate, the policy forbidding volunteers from becoming overly friendly with inmates and impliedly providing for the removal of such volunteers from prison volunteer programs would advance legitimate rehabilitation goals of the institution.

The defendants seek to take this line of reasoning one step further by arguing that to allow a former volunteer who became overly friendly with an inmate to visit that inmate would encourage inmates to become personally involved with volunteers. Therefore, defendants assert, the institution must prevent former volunteers from visiting inmates in order to deter other inmates from engaging in overly friendly relationships with volunteers at the institution. In support of this position, the defendants do no more than assert that this no-visitation policy will have such a deterrent effect because, in the absence of such a policy, "inmates would believe that the prison was condoning the very 'overly friendly' relationships the other policy is meant to prevent." Without more, this bald assertion fails miserably. I am not persuaded that a prison policy can regulate and contain the development of "overly friendly" relationships through this sort of far-removed sanction. The development of this no-visitation policy as a means of discouraging over-friendliness is the epitome of the sort of exaggerated response in prison policy to which courts owe no deference.

Defendants offer another rationale for the policy forbidding former volunteers from visiting individual inmates; that is, to protect volunteers from being exploited financially and emotionally by inmates. Unlike prisoners, whose constitutional rights are limited by their status as prisoners,

nonprisoner volunteers enjoy the full range of First Amendment rights afforded United States citizens. *See Procunier v. Martinez*, 416 U.S. 396, 408–09, 94 S.Ct. 1800, 1809, 40 L.Ed.2d 224 (1974). The prison may have certain responsibilities to protect volunteers who are entering the institution under the auspices of the prison administration. However, the participation of a nonprisoner in volunteer programs within the prison does not authorize the prison to exercise the sort of paternalistic regulation attempted here. No legitimate penological objective is served by a prison policy, such as the no-visitation rule, promulgated to prevent the exploitation of nonprisoners by inmates. This sort of institutional policy impinging on nonprisoners' First Amendment rights is truly an exaggerated response to any legitimate need to preserve the effectiveness of volunteers in prison volunteer programs.

From the evidence in the record, I am convinced that the plaintiffs have a reasonably good chance of prevailing on the merits of the First Amendment claim.

## B. *Due Process Claim*

■ Before proceeding to the next factor in preliminary injunction determinations, I will address plaintiffs' assertion that defendants' application of the prison policy violates their due process rights. As noted above, prison administrators may impose limitations on visitation to meet legitimate institutional objectives. However, prisoners are entitled to adequate procedural safeguards when limitations are imposed on visitation, such as meaningful written responses to their requests and opportunities for adequate review of decisions denying visitation rights. *Lynott v. Henderson*, 610 F.2d 340, 343 (5th Cir.1980); *Hamilton v. Saxbe*, 428 F.Supp. 1101, 1112 (N.D.Ga.1976), *aff'd sub nom. Hamilton v. Bell*, 551 F.2d 1056 (5th Cir.1977) (per curiam).

Plaintiffs contend that the defendants' refusal to allow visitation violates their rights to due process. First, plaintiffs ar-

gue that defendants erred in not considering the effects of visitation on Hardaway's rehabilitation. Second, the plaintiffs argue that the defendants erred in not meeting with plaintiff Beck upon her request to determine whether the policy should have been applied to deny her visitation rights. Third, defendants erred, according to plaintiffs, in assuming, without making a factual determination, that plaintiff Beck would be exploited by plaintiff Hardaway if visitation were allowed. Although plaintiffs may be able to prove that defendants did not engage in a thorough factual investigation into the facts of this case before applying the visitation policy, I am not convinced that the plaintiffs' contentions would make out a due process violation. If the visitation policy were valid, it would not be necessary to make a new inquiry into the reasons behind the policy every time the policy was applied. Because I have concluded the plaintiffs are reasonably likely to prevail on their First Amendment claim, I need not resolve the likelihood of success on the due process claim.

### 2. *Irreparable Harm*

■ Plaintiffs contend that no further showing of harm is necessary where an alleged constitutional deprivation is implicated and, additionally, that they will be irreparably harmed if this injunction is denied and they have no adequate remedy at law. The Court of Appeals for the Seventh Circuit has viewed a temporary deprivation of First Amendment rights as irreparable harm, sufficient to support the grant of a preliminary injunction. *Citizens For A Better Environment v. City of Park Ridge*, 567 F.2d 689, 691 (7th Cir.1975). I find and conclude that there is a significant threat in this case that plaintiffs will be irreparably harmed if the injunction is not granted.

### 3. *Balance of the Respective Harm*

Plaintiffs have alleged that they have suffered emotional distress as a result of defendants' denial of visitation rights and that this denial has had detrimental effects on plaintiff Hardaway's rehabilitation. Plaintiff Hardaway also claims he has suffered from physical ailments resulting from the denial. The plaintiffs also contend that they need face-to-face visitation to determine their feelings for each other and the potential for a long-term relationship after Hardaway is released from prison. Moreover, the plaintiffs assert that written and telephone communication does not replace face-to-face visitation in terms of the support and value of the contact. The plaintiffs also describe cost and privacy limitations on effective and extensive telephone communication.

Defendants assert that this threat of irreparable harm is speculative at best. Defendants further dispute the negative effects on their denial of visitation rights, claiming that the plaintiffs will have sufficient time before plaintiff Hardaway's release to evaluate the seriousness of their relationship through face-to-face visitation if they prevail at a trial on the merits of this case. They also assert that other counseling and advisory services are available at the institution to aid Hardaway's rehabilitation.

Based on these allegations of harm to the plaintiffs, I conclude that defendants underestimate the negative effects of their denial of face-to-face visitation between the plaintiffs. Plaintiffs have immediate interests in personal communication with one another which cannot be replaced by face-to-face visitation at some later date following a trial on the merits or by written communications or costly telephone calls. The plaintiffs' interests in such communication are not limited to their need to sort out their feelings for one another in order to determine the status of their relationship following plaintiff Hardaway's release from prison. On the contrary, plaintiffs have an interest in free expression throughout plaintiff Hardaway's stay in prison, which defendants cannot restrict arbitrarily. Furthermore, personal contact with family members and friends cannot be replaced by prison counseling and advisory services. Both the Supreme Court and fed-

eral prison administrators recognize the benefits to inmates of visitation with family and friends. *See Pell v. Procunier*, 417 U.S. at 827, 94 S.Ct. at 2806; Bureau of Prisons Program Statement No. 5267.3, dated July 1, 1980. Plaintiffs have demonstrated a threat of irreparable harm if the injunction is denied, based on the temporary deprivation of their First Amendment rights and the emotional harm and detrimental effects resulting from the denial of visitation rights.

Defendants have an interest in protecting prison volunteer programs. Defendants contend that the disputed policy furthers this interest by preserving individual volunteers' ability to assist inmates through volunteer programs. Issuance of an injunction would be at odds with the prison policy and defendants contend it would cause long-term damage to the efficacy of volunteer programs in the prison. However, defendants do little more than speculate as to this effect. Even if I accept defendants' assertion that visitation between volunteers and inmates on an individual basis would damage the vitality of volunteer programs, defendants have not shown persuasively that such visitation by a former volunteer would have such an effect.

In balancing the respective harms asserted by the parties, I conclude that plaintiffs assert a more direct threat than defendants and that the threatened injury to the plaintiffs outweighs the threatened injury to the defendants.

Unlike the situation in *Jordan v. Wolke*, 593 F.2d 772 (7th Cir.1978) (per curiam), where the allowance of contact visitation pursuant to the injunction would cost an unknown amount of money, a preliminary injunction in this case would impose no such costs on the defendants. Nor is there any indication here that allowing plaintiff Beck to visit plaintiff Hardaway might interfere with the orderly running of the

institution, as in *Lynott v. Henderson*, 610 F.2d 340 (5th Cir.1980), relied upon by defendants. In *Lynott*, the record contained allegations that the female visitor's husband had requested the prison to terminate her visiting privileges, that he had threatened to sue the prison if her privileges were continued, and that she had become verbally and physically abusive when her privileges were denied. Those factors indicated that allowing her to visit the prisoner might interfere with the orderly running of the prison. *Id.* at 343. No similar potential interferences are evident in this case. In fact, the defendants concede that Beck's husband never contacted or threatened the institution regarding Beck's visitation of Hardaway, that Beck reacted in a nonviolent, understanding manner when she was told she could not continue to visit Hardaway, and that she would not pose a threat to the security or good order of the institution.[3]

### 4. Public Interest

Plaintiffs argue that granting the preliminary injunction in this case will serve the public interest by aiding plaintiff Hardaway's rehabilitation. In rebuttal, defendants assert that granting the injunction will disserve the public interest because it will interfere with prison volunteer programs, thus impairing rehabilitation efforts that affect far more inmates than the plaintiffs' visitation rights affect. Even if I accept defendants' claim that allowing volunteers to be switched to inmates' visitor lists would damage prison volunteer programs, defendants have failed to prove that visitation between a former volunteer and an inmate would have a negative effect on prison volunteer programs. I remain unpersuaded by defendants' mere assertion that allowing former volunteers to visit inmates would indicate to other inmates that they could then engage in personal interaction with volunteers contrary to the "overly friendly" policy or that it would

---

**3.** Defendants have referred to a letter received from a relative of Beck, other than her husband, but have refused to disclose its contents claiming the Privacy Act of 1974 prevents such disclo-

sure. Plaintiffs objected to any reference to a letter that the defendants refuse to disclose in full. In view of plaintiff's objection, I have not given any weight to that letter.

cause the development of personal relationships that would not otherwise have arisen. While the public interest might be disserved by an injunction that would impair the viability of prison volunteer programs, defendants have not shown that this result will follow from the granting of an injunction in this case.

## ORDER

IT IS ORDERED that petitioners' motion for a preliminary injunction is GRANTED. Defendants are preliminarily enjoined from enforcing the prison policy that forbids visitation between inmates and former volunteers with regard to the plaintiffs.